McGINNISS et al. v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. February 13, 1919.)

No. 166.

1. CONSPIRACY ⊙⟂27—ESSENTIALS—OVERT ACT.
At common law, a conviction for conspiracy might be had without showing an overt act toward executing the conspiracy.

2. CONSPIRACY ⊙⟂27—OVERT ACT.
Under Cr. Code, § 37 (Comp. St. § 10201), it is necessary to prove, not only unlawful conspiracy, but that one or more of the parties did an act to effect its object.

3. CRIMINAL LAW ⊙⟂680(1)—CONSPIRACY—ORDER OF PROOF.
It is better practice to require evidence establishing a conspiracy before receiving evidence of overt acts to effect the conspiracy's object.

4. CRIMINAL LAW ⊙⟂510—EVIDENCE OF ACCOMPLICE—CORROBORATION.
The uncorroborated evidence of an accomplice, if straightforward and unequivocal, may sustain a conviction.

5. CRIMINAL LAW ⊙⟂780(1)—INSTRUCTIONS—TESTIMONY OF ACCOMPLICE.
Where a conviction is sought upon the uncorroborated testimony of an accomplice, the court should clearly instruct the jury to exercise care and caution in accepting it.

6. CRIMINAL LAW ⊙⟂561(1)—EVIDENCE—REASONABLE DOUBT.
A conviction may be had only upon evidence showing accused guilty beyond a reasonable doubt.

7. CONSPIRACY ⊙⟂48—EVIDENCE—DIRECTED VERDICT.
The unsupported testimony of an accomplice who contradicted himself and was discredited by his own testimony held to present no substantial evidence that defendant conspired with him to violate Cr. Code, § 37 (Comp. St. § 10201), by forging a document which should admit the

prosecuting witness into the United States Military Academy without taking a mental examination, and motion to direct an acquittal should have been granted.

In error to the District Court of the United States for the Eastern District of New York.

John J. McGinniss and Frank D'Ambrosia were convicted of conspiracy, and they bring error. Reversed.

Caldwell, Holmes & Bernstein, of Brooklyn, N. Y. (Frank W. Holmes and Eldred E. Jacobsen, both of Brooklyn, N. Y., of counsel), for plaintiffs in error.

John J. McGinniss, of New York City, in pro. per.

Melville J. France, U. S. Atty., of New York City (Vine H. Smith, Sp. Asst. U. S. Atty., of New York City, of counsel), for the United States.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

MANTON, Circuit Judge. The plaintiffs in error, and one Harry Tichenor Allison, were indicted for a violation of section 37 of the United States Criminal Code (Act March 4, 1909, c. 321, 35 Stat. 1096 [Comp. St. § 10201]). They were charged by indictment with—

"falsely making a certain writing for the purpose of defrauding the United States by obtaining the admission of the said Allison as a cadet at the United States Military Academy at West Point, New York, without his being subjected to an examination, he, the said Allison, being not then and there possessed of the educational qualifications required by the United States in the case of candidates admitted to the said academy without any examination as the said defendants and each of them at the time or times when they severally participated in said conspiracy well knew, that is to say, the said defendants conspired and planned that certain form entitled form I, provided by the United States to candidates seeking admission to the said academy without examination, should be filled in with statements in writing so that the said form as so filled in should falsely state that said Allison had certain educational qualifications which in fact he did not have, as the said defendants and each of them at the time or times aforesaid well knew, and further conspired and planned that the said writing when so filled in should bear a forged signature purporting to be the signature of the president of an institution of learning certifying to the statements set forth in the said writing; and further conspired and planned that said writing should purport to have been acknowledged by such president before Frank D'Ambrosia, one of the defendants above named, and that said writing so filled in, signed and acknowledged, should be submitted to the authorities at the United States Military Academy aforesaid for the purpose of procuring admission to the said academy of the said Allison."

McGinniss was charged in the indictment with having affixed a certain stamp thereon and with writing in the body of the acknowledgment, "Frank W. Atkinson, Ph. D., Polytechnic Institute * * * 14 February, * * * 8," and with having received from Allison $50. D'Ambrosia was charged with having acknowledged the signature of Atkinson as being his act and deed when he knew that it was not an acknowledged act of Atkinson's. Allison was charged with forging the name of Frank W. Atkinson, Ph. D., to this paper and sending the same to the military academy at West Point in order that he might be admitted without an entrance examination. Allison pleaded guilty and became a

witness for the government and, as far as we are able to ascertain, gave the only evidence as to the occurrences which in any way involve either of the plaintiffs in error. He testified that he met McGinniss in May, 1917, on an occasion when he went to the latter's office to acknowledge the execution of a paper relating to his entrance to a military training camp at Plattsburg, and that his first talk with McGinniss concerning this particular paper was a week before February, 1918, and that he had not seen D'Ambrosia between May, 1917, and February 14, 1918. On this latter day he says he went to McGinniss' office and there saw only McGinniss, at which time he (Allison) had the form one-third filled out. McGinniss looked at the paper and said if he wanted it filled in to come back later as D'Ambrosia was not there. Allison took the paper away with him and came back at about 5 o'clock with the paper all filled in with the signature Frank W. Atkinson written thereon by himself. He was unable to state whether or not it was stamped "Polytechnic Institute." Further, that the name "Frank D'Ambrosia" was not put on the paper in his presence. When he came back at 5 o'clock, he says McGinniss opened the door and he had a conversation with him about the price and gave him $50. That he left the paper at McGinniss' office, calling later, at about 8 o'clock that evening, and took the paper home with him. At this last call, he saw neither McGinniss nor D'Ambrosia. The paper was given to him by some woman.

The other witnesses called by the government were Frank W. Atkinson, president of the Polytechnic Institute of Brooklyn, who says he did not sign the paper or acknowledge its execution, and Taton and Dowden, officers connected with the Department of Justice. Their testimony deals only with what occurred at the time of the arrest of Allison and D'Ambrosia, at which time Allison declared that the arrest was a "frame-up," and D'Ambrosia said, "Do you know me?" to which Allison replied, "I never saw him before."

Another witness, Schbley, testified that she at one time saw Allison walking in the direction of McGinniss' office on the 14th of February, 1918.

D'Ambrosia and McGinniss both took the stand in their own behalf. The former testified of his recollection of the call of Allison, and that on the day in question Allison came in first, alone, asking him to take the acknowledgment of Atkinson, which he refused to do without seeing the affiant. Later, Allison returned with a man who was represented to him to be Atkinson, at which time D'Ambrosia says he went through the formalities of asking, "Is that your signature?" and he said, "Yes," and, "I put my seal on it."

McGinniss, a member of the bar, testified in his own behalf. He described his office as having two large rooms "like a front and back parlor," at No. 126 Willoughby street, Brooklyn. He says it was in the winter time, and he had a fire burning in the grate; that he was standing outside near the fireplace in the main office when Allison came along, and stated that he wanted to have an acknowledgment taken. McGinniss asked him if that was his (Allison's) signature, to which he said, "No." McGinniss then advised him that it was necessary to

bring Atkinson before a notary. Allison then said he was making an application for entrance into West Point; asked him to look at it, and then fill out the acknowledgment. McGinniss further told him D'Ambrosia was out and then returned the paper to Allison and the latter left. He says that the name "Frank W. Atkinson, Ph. D.," was on the paper at the time, and also the stamp, "Polytechnic Institute." That he filled in the blank in the acknowledgment, "Frank W. Atkinson * * * 14 February, * * * 8," and that he told Allison to take Atkinson to a notary, and he said he never received any money from Allison or had any further conversation with him about the matter.

The cross-examination of Allison indicated many contradictions, illustrated by his several versions of when he met McGinniss at the Graham Café previous to the time of the alleged taking of the acknowledgment, and, further, the recollection of what occurred at the time of the arrest. His statement in one place that he wrote the signature "Frank W. Atkinson" at his home, whereas he stated on direct examination that it was written in McGinniss' office.

The indictment charged a conspiracy to commit an offense, not to commit a fraud. The district judge, however, submitted the case to the jury as a conspiracy "for the purpose of defrauding the United States by obtaining the admission of a man by the name of Allison to the military academy at West Point."

Section 29 of the Criminal Code (Comp. St. § 10193) provides that—

"Whoever shall falsely make, alter, forge, or counterfeit, or cause or procure to be falsely made, altered, forged, or counterfeited or willingly aid, or assist in the false making, altering, forging, or counterfeiting, any * * * order, certificate, receipt, contract, or other writing, for the purpose of obtaining or receiving, or of enabling any other person, either directly or indirectly, to obtain or receive from the United States, or any of their officers or agents, any sum of money; or whoever shall utter or publish as true, or cause to be uttered and published as true, any such false, forged, altered, or counterfeited * * * contract, or other writing, with intent to defraud the United States, knowing the same to be false, altered, forged, or counterfeited; or whoever shall transmit to, or present at, or cause or procure to be transmitted to, or presented at, any office or officer of the government of the United States, * * * contract, or other writing, in support of, or in relation to, any account or claim, with intent to defraud the United States, knowing the same to be false, altered, forged, or counterfeited, shall be fined," etc.

Under this section, if the forged document in question was intended to be used by Allison in fraud, and thus obtaining entrance into West Point Military Academy, it would be a crime, and, if the plaintiffs in error conspired with Allison to commit this offense against the United States, they would be guilty of the crime of conspiracy, providing the proof established beyond a reasonable doubt that such a conspiracy was formulated.

[1-3] In the charge of conspiracy at common law, the unlawful combination was said to be the crime, and it was not necessary to aver or to prove an overt act. Section 37 has gone beyond such rigid abstraction and prescribes as necessary to the offense not only the unlawful conspiracy but that one or more of the parties must do an act to effect its object, and provides that, when such act is done, all

the parties to such conspiracy become liable. Hyde v. United States, 225 U. S. 347, 32 Sup. Ct. 793, 56 L. Ed. 1114, Ann. Cas. 1914A, 614. In the earlier case of United States v. Britton, 108 U. S. 199, 2 Sup. Ct. 531, 27 L. Ed. 698, Judge Woods said:

"The offense charged in the counts of this indictment is a conspiracy. This offense does not consist of both the conspiracy and the acts done to effect the object of the conspiracy, but of the conspiracy alone. The provision of the statute, that there must be an act done to effect the object of the conspiracy, merely affords a locus penitentiæ, so that before the act done either one or all of the parties may abandon their design, and thus avoid the penalty prescribed by the statute. It follows as a rule of criminal pleading that in an indictment for conspiracy under section 5440, the conspiracy must be sufficiently charged, and that it cannot be aided by the averments of acts done by one or more of the conspirators in furtherance of the object of the conspiracy."

And again in Pettibone v. United States, 148 U. S. 197, 13 Sup. Ct. 542, 37 L. Ed. 419, the Supreme Court said:

"That the conspiracy must be sufficiently charged, and cannot be aided by averments of acts done by one or more of the conspirators in furtherance of the object of the conspiracy."

Therefore, it would appear that prior to the decision in Hyde v. United States, supra, it was incumbent upon the prosecution to establish a conspiracy to plead in the indictment, and prove as the gist or gravamen of the offense, the conspiracy. Now, due to the phrase of the statute and its interpretation in the Hyde Case, a conspiracy alone does not constitute the offense. It needs the addition of the overt act. Such act is something more than evidence of a conspiracy. It is held to constitute the execution or part execution of the conspiracy, and by such execution or part execution the crime is consummated. But this change or addition which has found its way into the crime of conspiracy cannot be held to excuse the government from establishing that a conspiracy in fact existed, and this should be established before evidence of the overt act to effect the object of the conspiracy is received. It is now too common in the everyday trial of cases in conspiracy, to permit proof of alleged overt acts which inflame and prejudice the minds of juries without first sufficiently proving that a conspiracy in fact exists. Better practice for the due administration of the law is to require evidence establishing a conspiracy before evidence is received as proof of overt acts to effect the object of the conspiracy.

[4-7] We are satisfied that the evidence here falls far short of even presenting for the jury a question from which might be inferred an agreement to an unlawful thing, and, in particular, to do the unlawful thing of forging a document that was to be used for the purpose of defrauding the United States. Considering Allison's evidence at its face value, it does not indicate the slightest knowledge by D'Ambrosia of what the paper to which he put his name as commissioner was to be used for. A conviction may be had in the federal courts upon the uncorroborated evidence of an accomplice if the story, as told, is straightforward and has a ring of truth and indicates unequivocally the guilt of the accused. Bosselman v. United States, 239 Fed. 84, 152 C. C. A. 132. The presiding district judge, however, in a case where

it is sought to convict upon the uncorroborated testimony of an accomplice, should cautiously and sharply direct the jury's attention to the exercise of care and caution in viewing such evidence and that the testimony of the accomplice be convincing proof of the guilt of the accused. We find nothing in the charge of the court which indicates such caution. He was a confessed cheat and forger, and a deserter from the army, and as an imposter was still under investigation by the Department of Justice. A mere reading of his testimony indicates a discredited character, whose mental condition might, with decent curiosity, be inquired into. Most of the questions which formed the basis of his main narrative were of a leading character, and his frequent evasive answers, such as: "I am kind of shady about that." "I cannot remember so." "Well, if I have forgotten that is a minor affair." "I cannot remember because I have been through a whole lot since February 14th." "I have had different kinds of treatment since that and it is out of my head." "No, sir; I cannot remember that unless you bring it up." When asked if he put the stamp, "Polytechnic Institute," on the document, his answer was: "If I did, I have no knowledge of it, sir." At one time in his testimony, he says that he gave McGinniss $50; another time, $100; and, still another version, that he gave him an "Admiration" cigar. His flippant manner, requiring caution by the court for directness of reply, his resort to a claim of untrusty memory and hazy recollection, his contradictions as to the occurrence when he met the plaintiffs in error at McGinniss' law office, and his disclaimer of having paid any money when arraigned before the United States commissioner at which time he charged the government officials with trying to "railroad me," all emphasize the untrustworthiness of the witness' testimony and make it unworthy of belief. It is only when the evidence is sufficiently convincing of the guilt of the accused beyond a reasonable doubt that one may lawfully be convicted of a crime, and, in a case such as this, the better practice was not to place reliance upon the testimony of this accomplice and to require corroborating testimony before giving credence to him. Holmgren v. U. S., 217 U. S. 509, 30 Sup. Ct. 588, 54 L. Ed. 861, 19 Ann. Cas. 778. We feel required to say that the uncorroborated testimony of this perpetrator of a crime, confessed under oath, and not supported by other witnesses, with a possible hope of immunity from punishment, is not only insufficient to establish the guilt of the plaintiffs in error beyond a reasonable doubt, but that it presents no substantial evidence of it.

In rebuttal, the government offered records of a conversation had between the plaintiffs in error at McGinniss' law office, which were taken by the use of a dictagraph. Apart from the unfortunate blasphemy and vulgarity of expressions had, there is nothing that was said at this conference which in any way corroborated the testimony of Allison. On the other hand, the receipt of such evidence, with all its moral delinquencies, could not but have had an adverse effect to the plaintiffs in error upon the minds of the jury. Such expressions, which we do not deem it necessary to recite here, could but create in the minds of the jury a low estimate of the morals of the two plaintiffs in error, with a consequential prejudice. The practice of entering

into the confidential domain of a lawyer's office, installing this instrument, and, by such method of eavesdropping, enter into the confidences of the defense, ought not to be encouraged. It is sufficient to say here that it did not in any way help the government's case in establishing either corroboration or the guilt of the accused. But it undoubtedly inflamed the jury and prejudiced the plaintiffs in error beyond the hope of a fair and impartial trial. The plaintiffs in error may not be lawfully deprived of their liberty for a period of one year and six months without proof of their guilt beyond a reasonable doubt, much less without substantial evidence of it, and we cannot permit the perpetration of such an injustice, since it rests solely upon the testimony of Allison. We are of the opinion that the district judge should have granted the motion to direct an acquittal.

Judgment reversed.