**UNITED STATES of America,**
**Appellee,**

**v.**

**Giacomo REINA, Joseph Valachi, Pasquale Moccio, Pasquale Pagano and Larry Quartiero, Appellants.**

**No. 160, Docket 24321.**

United States Court of Appeals Second Circuit.

Argued Feb. 11, 1957.

Decided March 19, 1957.

---

**304**

Menahem Stim, Curran, Mahoney, Cohn & Stim, New York City, for appellant Valachi, Allen S. Stim, John F. Kelly, New York City, of counsel, for appellant Valachi.

Michael P. Direnzo, New York City, for appellant Moccio.

Jacob W. Friedman, New York City, for appellant Pagano.

Herbert M. Wachtell, New York City, for appellee.

Before HAND, HINCKS and WATERMAN, Circuit Judges.

HAND, Circuit Judge.

These are five appeals from convictions for conspiracy to sell heroin contrary to the statutes of the United States (sections 173 and 174 of Title 21 U.S.C.A. and sections 2553(a), 2554(a) and 2606 of Title 26 of U.S.C.). The evidence showed a conspiracy made up of many persons which had been in existence before any of the appellants were proved to have joined it. A number of other parties to it had already been convicted at the time of the trial, and the first and only important issue is whether the five appellants were shown to be parties to the general conspiracy. We need not discuss this issue as to the appellant, Reina; regardless of the competence of the testimony of the informer Lafitte,

enough was proved completely to implicate him in the general conspiracy as the indictment charged it. This evidence, if believed, proved that in 1949 or 1950 a number of persons, among them Orsini and Giannini, confederated together to import heroin on a large scale into this country from France and Italy. Orsini was convicted upon an earlier indictment and Giannini is dead. Their principal method was to dispatch subordinates to these countries, who took with them on the ships on which they sailed motor cars with secret compartments in which to hide the drugs. After the subordinates had received their allotments abroad they brought them back in the motor cars and delivered them to the principals who sold them through peddlers.

More particularly, the evidence justified a finding of the following facts. In April, 1951 Orsini was in custody at Ellis Island, awaiting deportation after conviction for another crime. There he came in contact with Lafitte, who was also in custody, and whom Orsini engaged to take his place in the venture after disclosing to him its details. Among the lesser confederates was Shillitani, who was later convicted as a co-conspirator, and who had been Orsini's especial agent. Lafitte was released from Ellis Island on the 29th of May, and soon became an informer for the Treasury Department, apparently through a Treasury agent, one, Giuliani. Lafitte introduced himself to Orsini's mistress, who was also later convicted, and who in turn introduced him to Shillitani and Shillitani's wife. Lafitte and Mrs. Shillitani tried to enlist Shillitani with them, but he was suspicious of Lafitte, until Lafitte, Mrs. Shillitani and Orsini's mistress had an interview with Orsini, who told Mrs. Shillitani to assure her husband that dealing with Lafitte was like dealing with him. This apparently laid Shillitani's doubts, and he began to deal with Lafitte. Lafitte introduced to him a Treasury agent, Pocoroba, and on July 1st, 1951, they all agreed that Shillitani should procure a quarter of a kilogram of heroin for Pocoroba, which a "runner"

of Shillitani delivered to Pocoroba on the following night and for which Pocoroba paid Shillitani $3,300. The drug turned out to be of inferior quality and Lafitte and Pocoroba complained of it to Orsini. Later Shillitani and Lafitte, in search of the seller of the heroin went to a restaurant in the Bronx which Shillitani entered, leaving Lafitte in the car. When he came back he said that the seller was not there; but as they were about to leave, the appellant, Valachi, appeared and Shillitani said to him: "Joe, that merchandise you gave us, that is not par, it's not what you said it is. I got the guy with me and he is kicking like hell." Valachi replied: "I can do nothing. It is the way I get it, it is the way I give it. I give you my word I never touch it. The way I get it is the way I give it to you. Any further time I can make good for it, let us see." This is the only testimony that we can find in the record, except the declarations of Valachi's putative confederates, that connected him with the general conspiracy.

Pagano, Moccio and Quartiero were shown to have been parties to one importation of heroin from France by the following evidence. One, Salas, a South American, was a steward on the Steamship Washington in July, 1951. He had long known the appellant, Quartiero, who on July 25 introduced him to Pagano. Pagano told Salas that, if Salas would bring some drugs from Le Havre to the United States he would give him $2,000. The drugs would be delivered to the S.S. Washington at Le Havre, and he was to secrete them on board and deliver them in New York. Pagano would meanwhile fly to Le Havre, give Salas the package, and fly back to New York in time to receive the drugs. Salas agreed, and on July 26th Pagano flew to France where, upon the ship's arrival, Pagano met Salas, delivered to him a package

of about ten pounds in weight, saying: "If you lose it, you'll ruin me for the rest of my days." Salas secreted the package during the voyage and on August 4th Pagano flew back. The ship reached New York on August 11th. Salas went ashore, met Quartiero, who asked him if everything had gone smoothly and whether "the junk was O.K." Together they went to a bar on 8th Avenue where they found Pagano, Moccio, and another man who Moccio told Salas was "going to take the package ashore." After delivering the package to this man Salas was told first to go home and then to a restaurant where he would meet Quartiero and be paid. Salas went to the ship, the man arrived and Salas gave him the package. That night Salas went to the restaurant where he met Pagano, Moccio and Quartiero. Moccio asked Salas whether he would object to his paying Salas through Quartiero, and Salas agreed. Moccio then drew out some money and gave it to Quartiero, after which he and Pagano left. Quartiero came back and gave Salas $900, saying: "These fellows can't afford to pay off now," but adding that Salas would receive the unpaid $1,100 before the ship sailed, which however he never did. Again, the foregoing is the only evidence we can find in the record that connects Moccio and Quartiero with the conspiracy, except the declarations of confederates.

First as to Valachi. We think that his conviction must be reversed on the ground of the Statute of Limitations, quite aside from any other reason. The amendment of § 3282 of Title 18, extending the period of limitation to five years was not passed until September 1, 1954. Hence, if the crime had been committed before September 1, 1951, it was barred.[1] Moreover, since there must be some "overt act" within the period of limitation, it was necessary to prove one

---

[1] Section 10(b) of the Act of September 1, 1954 provided: "The amendment made [to 3282] by subsection (a) shall be effective with respect to offenses (1) committed on or after the date of enactment of this Act, or (2) committed prior to such date, if on such date prosecution therefor is not barred by provisions of law in effect prior to such date." 18 U.S.C.A. § 3282 note.

after September 1, 1951.[2] The only "overt acts" after that date that the judge left to the jury, were two, one in June, 1952 and the other in August, 1952; and both were after the sale by Valachi to Pocoroba on July 2, 1951. Valachi was not connected with either of them. The prosecution answers that this was unnecessary, because, once it is shown that a person has become a party to a conspiracy the law presumes that he remains a party while it continues, unless he shows that he has left it. Therefore, since Valachi did not show that he had broken off his connection with Shillitani, he remained a party until after September 1, 1951, and the "overt acts" will serve. We should accept this reasoning, if we thought that Valachi's sale of the parcel to Pocoroba was evidence that he knew it was in execution of the larger venture: that is, that he was cooperating in the series of importations that made up the conspiracy charged. His sale was indeed not inconsistent with that knowledge; but it was equally consistent, so far as we can see, with his being an independent peddler of narcotics, whom Shillitani selected as the most immediately available source of supply for Pocoroba's needs. In deciding that there was no evidence forbidding this second possibility, we may not consider any declarations of the proved conspirators, such as Orsini or Shillitani, for these were hearsay until Valachi's connection with the conspiracy was proved by other evidence. His own declaration was of course competent against him, but it was altogether equivocal as to the source of his supply. Indeed, were we to speculate, we should incline to read it as indicating that he bought at random. For these reasons we hold that the statute had run on May 16, 1955 as to Valachi. This result is quite independent of whether under the doctrine of Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557, and Blumenthal v. United States,

332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154, the variance between the allegation and the proof was, or was not, "harmless."

■ On the other hand, there can be no doubt that the statute does not protect Pagano, whom, quite aside from the transaction with Salas, the evidence proved to have been deep in the general business of the "ring," of which Salas's importation was a part. The "overt acts" of June and August 1952, being in execution of this general conspiracy, were late enough to support the indictment. The evidence against Moccio and Quartiero requires, however, a little analysis. Although Lafitte's testimony does not touch either of them, a jury might infer from their transaction with Salas that they were parties to the general enterprise. In addition to what we have already set forth, Salas testified that on August 11, 1951, when Quartiero "dropped me off at 67th Street" he told him that "if I stick to them I am going to make big money in no time"; and from this alone the jury might have found that Quartiero at any rate was inviting Salas into an undertaking that comprised more than the single imported parcel and was general in scope. Salas's further testimony as to what took place on the evening of the same day confirmed such a conclusion and of itself was enough to support the verdict against Moccio. The value of the parcel as contraband, judged by the agreed price for the Valachi package, must have been in the neighborhood of $50,000. Pagano, as Moccio knew, had bought it in France and had smuggled it in; and when Moccio paid Salas it was obvious that he did so, either because he was the buyer himself, or was an agent of Pagano, or of Pagano's principals. If he was a buyer, the quantity proved that it was not for his own use, but for sale as contraband. In short, he was an outlet, or customer, of the importers who were obviously Pagano's principals. That was alone

2. Brown v. Elliott, 225 U.S. 392, 401, 32 S.Ct. 812, 56 L.Ed. 1136; Fiswick v. United States, 329 U.S. 211, 216, 67 S.Ct. 224, 91 L.Ed. 196.

enough to charge him as a conspirator.[3] It is true that the evidence did not connect Quartiero or Moccio with the conspiracy after August 11, 1951, but since they were shown to have become parties to it then, the presumption applied to them that they continued in it until they proved that they had left it, which they did not try to do.

 The doctrine of Kotteakos v. United States, supra, and Blumenthal v. United States, supra, does not extend to the conviction of the other four appellants. We are not indeed altogether sure that we understand its exact limits, as it was modified by the second decision. Certainly there is no "variance" between the charge in the indictment and the convictions that we are affirming. If there was error in trying Valachi along with the others, because of the possibility that the jury might sweep him into the wider undertaking because of his association with the others, that was an error of which he alone may complain. It would be gratuitous to suppose that the evidence against him could have turned the scale against them.

 The next alleged error is that the court should not have allowed the jury to consider the testimony of Lafitte and Salas. It is true that only Valachi challenges Lafitte's testimony, but we will assume that Moccio and Quartiero would be entitled to the benefit of the error, if there was one. Lafitte was endlessly cross-examined, and we will take it that his credibility was successfully attacked by the contradictions which emerged between what he had sworn to before and his testimony at the trial; and that his character and background showed him to be "a person of low moral character," as the prosecution itself declared him to be in another proceeding. All this appeared upon this trial, and we cannot understand on what theory it is supposed that the judge should not have allowed the jury to consider his testimony, and rely upon so much of it as they chose. The decision of the Supreme Court in Mesarosh v. United States, 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1, is completely different. The evidence that determined the court to reverse that conviction had not been discovered at the trial, and had never been before the jury; and the Solicitor General had recommended that the issue should be examined in the district court. The only question was whether the relief should be so limited, or whether the conviction should be reversed without more, as to which the court divided. It has been held over and over again that in federal jurisprudence a conviction may depend upon the uncorroborated testimony of an accomplice.[4] Furthermore, with the exception of perjury, where the procedure descends to us from the ecclesiastical law, and of treason as to which the statute of Edward III required two witnesses, our law has never undertaken to set any quantitative standards of verity; we have unconditionally left it to the jury to determine how persuasive the testimony of any witness shall be. In McGinniss v. United States, 2 Cir., 256 F. 621, we disregarded both these limitations upon the prerogative of the jury; it was an inadvertence and we take this occasion to overrule it.

 The other alleged errors do not need extended consideration, for they are quite without merit. The testimony of the interpreter who acted for Cusack, the Treasury agent, in France was competent, not only because of Cusack's testimony that he knew enough French to understand Ansaldi, but because the interpreter was himself an accomplice, acting as such at the time. The judge was so plainly within his powers in commending Salas, that it is strange that the

3. United States v. Bruno, 2 Cir., 105 F. 2d 921, reversed on another point, Bruno v. United States, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257; United States v. Todaro, 2 Cir., 145 F.2d 977.

4. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680; United States v. Manton, 2 Cir., 107 F.2d 834, 839; United States v. Compagna, 2 Cir., 146 F. 2d 524, 527; United States v. Rosenberg, 2 Cir., 195 F.2d 583, 592.

objection should be seriously urged. So too of the examination of the jurors on *voir dire*, the use of the photographs in the "Rogues Gallery," the charges of bias on the part of the judge and the supposed improper conduct of the prosecuting attorneys.

Convictions of Reina, Quartiero, Pagano and Moccio are affirmed.

Conviction of Valachi is reversed.