**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Chris CARDI and Virgil Cimmino,
Defendants-Appellants.**

**Nos. 72–1005, 72–1167 and 72–1159.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 1, 1972.

Decided April 16, 1973.

Rehearing Denied No. 72–1005.
July 2, 1973.

Albert E. Jenner, Jr., Thomas P. Sullivan, Alan L. Metz, Robert S. Bailey, Chicago, Ill., for defendants-appellants.

James R. Thompson, U. S. Atty., William T. Huyck, Asst. U. S. Atty., Chicago, Ill., Sidney M. Glazer, Kirby W. Patterson, Criminal Division, U. S. Department of Justice, Washington, D. C., for plaintiff-appellee.

Before SWYGERT, Chief Judge, CASTLE, Senior Circuit Judge, and PELL, Circuit Judge.

SWYGERT, Chief Judge.

Appellants Cardi and Cimmino appeal their convictions of conspiracy to conceal, buy and sell narcotic drugs known to have been unlawfully imported and of three substantive counts charging the unlawful sale of such drugs.[1] Although separate appeals were filed by each defendant, on motion of the Government they were consolidated for purposes of oral argument and will be treated together for purposes of this opinion.

The Government's evidence consisted primarily of testimony by two witnesses, Paul Moore, a law school student and paid informer for the Bureau of Narcotics, and Federal Narcotics Agent Saul Weinstein. According to their testimony, Moore and Weinstein conceived the idea that they might infiltrate certain groups which they believed to be dealing in the Chicago area narcotics traffic by posing as partners trying to establish a narcotics business in the various college communities. Pursuant to that plan on September 13, 1970 Moore asked Micelli, a fellow employee at a restaurant where Moore worked part-time, if Micelli could provide a source for the sale of hard drugs to Moore and an unnamed partner who wanted to get in the campus drug business. Micelli referred Moore to his nephew, Virgil Cimmino, who he said could take care of him.

Subsequently on September 14, 1970 Moore went to Chris Cardi's house where he explained his plans to Cimmino and requested that Cimmino get certain prices on heroin and cocaine from his sources. A meeting between Cimmino, Moore and Weinstein was set for September 16. Cimmino failed to keep the appointment. Moore located Cimmino at Cardi's home on September 19 and asked him why he had not met them. Cimmino responded by saying that his sources had been out of town. Another meeting was arranged for the following evening. Weinstein failed to make that meeting, and Moore and Cimmino arranged another for the following evening. Cimmino again failed to appear and this time both Moore and Weinstein went to

---

[1.] Appellants Cardi and Cimmino, together with a codefendant, Frank Micelli, were charged in a seven count indictment which, in addition to the conspiracy and substantive counts mentioned above, contained three counts charging sales of narcotics without the required order form in violation of 26 U.S.C. § 4705(a). Appellant Cardi was acquitted of the section 4705(a) counts, but was found guilty on the conspiracy count and the three substantive counts charging individual sales. Cimmino was convicted on all seven counts including the conspiracy, substantive sales, and section 4705(a) transactions. Micelli was found not guilty of all counts.

Cardi's house to find Cimmino. When they arrived they found Cimmino and Cardi standing beside Cimmino's car talking together. Moore introduced Weinstein to Cimmino and the three discussed the plan to enter the narcotics business with Cimmino as the supplier. During this conversation, Cardi was leaning against Cimmino's car and also walking on the lawn. There is no evidence, however, that he took part in the discussion.

Moore and Weinstein next met Cimmino in Elmwood Park, Illinois, where Cimmino gave them a bag which he said contained four ounces of heroin. In exchange Moore gave him $4400. Upon testing the substance at a later time, Weinstein discovered that it was flour instead of heroin. Moore and Weinstein immediately began searching for Cimmino, but were unable to locate him. The next day they drove to Cardi's house where Moore told Cardi about the bogus sale. Moore and Weinstein both testified that Cardi responded, "If it was anybody but you, I wouldn't talk about the stuff. But I will check into it and do whatever can be done. . . . You'll get it."

Two hours later Cimmino reached Moore by phone, saying: "Are you trying to get me killed? . . . You're going to get your stuff. Dickie [Cardi's nickname] is on my back. He slapped me around and I lost my job collecting. I had five or six stops and I was making $150 a week." Weinstein

demanded that Cimmino produce real heroin or return the money. The next day Cimmino met Moore and Weinstein and gave them four ounces of heroin. This sale was the basis of Count III of the indictment.

On September 30 Cimmino agreed to procure an additional eight ounces of heroin for Moore. The following day, October 1, he delivered a sock containing the heroin to Moore and Weinstein at a restaurant in Chicago. Moore paid Cimmino $8800 for the heroin and asked Cimmino to arrange for a further sale of eight ounces of cocaine for $8000. This order was confirmed by a telephone conversation between Cimmino and Moore on October 13. The delivery was made on October 15 when Cimmino delivered the drugs in a black sock and received the $8000. The October 1 sale was charged in Count V of the indictment and the October 15 sale in Count VII. Both Cardi and Cimmino were found guilty of Counts III, V and VII.

Although the October 15 sale was the last actual sale, Moore and Cimmino continued to have telephone conversations concerning possible future sales. Moore's attempt to arrange a meeting with Cimmino's source was unsuccessful, but he did manage to tape a phone conversation in which Cimmino made numerous references to Cardi. Over the defendants' objection, that recording was played for the jury and they were given written copies to follow while it was being played.[2]

2. The pertinent parts of that conversation are:

 Cimmino: Yea, ya know I told, I told Dick.

 Moore: Ya.
 Cimmino: I told him that you checked it out and everything.
 Moore: Ya.
 Cimmino: I told him I said, I called Paul and he checked it out. I said, he says, ya know, wa how does he know its IRS; ya know, what I mean? I says he checked it out!
 Moore: Ya.
 Cimmino: Ya know.

 * * * * *

 Moore: It's not IRS, its ah, IRS is federal.
 Cimmino: Ya that the little FBI ah?
 Moore: Na its a, the little FBI is the IBI, the state.
 Cimmino: But this guy is internal revenue he's gotta be watchin ah my uncle, right?
 Moore: Ya it looks like he's
 Cimmino: I'm right here, that why I'm talking like this. I'm on Grand and Harlem.
 Moore: Oh, yea?
 Cimmino: Yea.
 Moore: Oh, I thought you were in that tavern.

The remaining Government evidence consisted of testimony by two narcotics agents that on November 25 they observed Cimmino and Micelli drive to Cardi's house and go inside. Shortly thereafter Cardi and Cimmino left the house and returned half an hour later accompanied by Micelli. The three defendants remained in the house for approximately thirty minutes before Cimmino and Micelli left and drove home.

Cimmino, testifying in his own behalf, related a different version of the facts. Cardi, who did not testify, relies heavily

\* \* \* \* \*

Cimmino: He ain't just going to come up with a big one and say, "Well, here, here's for your guys." Because it is I don't know. If he wants it tell him I'll give it to him for nine, it amounts to the same fucking price.

Moore: Yeah, he's a little afraid of the other guy too, I don't think he'll deal with ya anymore. But I'm going to try to find him. I saw him.

Cimmino: What other guy? Don't even mention it on the phone. The guy that you approached.

Moore: No, D.C.

Cimmino: Yeah, but what makes him afraid of this other guy? You should tell him I'm not with him.

Moore: I told him, but he says that guy controls Virgil and he doesn't want to be dealing with that stuff, and we're going to get in trouble with him.

Cimmino: He don't have to know a mother fucking thing. He don't have to know nothing, just tell him I'm not with the guy, that's all. I'm on my own tell him that's the only fucking thing you can tell him.

Moore: What do I do when he calls me?

Cimmino: What do you mean when he calls you?

Moore: When Dick calls me. He says, "What is he doing with you, who are you?"

Cimmino: Well, he knows that I go to the Bear and talk to you, what the fuck that's no problem. He knows that I'm out with somebody else fucking around do you understand what I'm talking about?

Moore: Yeah.

Cimmino: I mean, he knows where I'm running with the guys from 26th Street. What the fuck you know what I mean, he knows what I'm doing. Yeah I gotta be here because I got a little money on me, are you nuts or what? He don't know what I got every time he sees me I'm broke, do you understand?

Moore: Yeah, yeah.

Cimmino: He gives me money, do you understand that? What the fuck he don't know what I'm doing. The only reason why he says that is because of the fucking uncle. Do you understand? He made a crack, you know my uncle, he makes a big thing out of things, and this is what happened. Do you what he told me right to my face? He says, if you want to do it go ahead you'll make a ton of money. But you know what he said?

Moore: What?

Cimmino: He says I can't afford the heat around me. You understand that? He says I can't afford no heat like that around me . . . He says I got enough, this is the truth now. He says you ought to go do it he says you'd make a ton of fucking money.

Moore: Well then he did tell you to do it.

Cimmino: Yeah, he says go ahead, but you can't come around me too much he says because, now this is between us Paul.

Moore: Yeah, I would never tell anybody that Dickie told you to do it.

Cimmino: This is between us.

Moore: Yeah.

Cimmino: He says go ahead make yourself a ton of money. But he says I can't afford that kind of heat on me. You know.

Moore: Yeah.

\* \* \* \* \*

Moore: Yea, well, I'm going to try to find the Jew I'm going to tell him first of all, that as far as Dickie is concerned, there's no heat from him. He don't care that you do it or not. He told you to go ahead and do it.

Cimmino: Right, but he just don't want me, you know.

Moore: To be around him when you do it.

Cimmino: Right.

Moore: OK, ah, this will relieve a lot of his tension, you call me tomorrow, or see me tonight.

Cimmino: Can I ask you one thing, this don't make sense.

Moore: Yea.

Cimmino: If you tell this guy that Dick continued what I'm doing and there ain't nothing said, what's the difference if he deals with me? Does that make sense? What the fuck does he have to meet my guy, you understand? My guy says what the fuck does he gotta meet me for when I got you.

on Cimmino's testimony. According to Cimmino, the plan to sell narcotics was conceived by Moore and forced upon him. Cimmino stated that he owed Moore money and that he had feared Moore because he believed that Moore had been responsible for a gunshot wound he had received from a passing car in 1968. Nevertheless, Cimmino admitted that in 1970 he had been spending considerable time with Moore on a social basis. It was during this time, according to Cimmino, Moore proposed that they "screw" a rich person that he knew. Moore suggested that they do this by selling him flour instead of heroin. Cimmino told Moore that he wanted no part of it and he intentionally failed to show up for several meetings which Moore arranged. Under mounting pressure from Moore, Cimmino finally agreed and did in fact give Weinstein four ounces of flour in exchange for $4400 which he was to split with Moore. Cimmino stated that he was puzzled when Moore and Weinstein came looking for him and that he tried to call Moore to find out what was wrong. When Cimmino finally reached Moore, after Moore and Weinstein had talked to Cardi, Moore gave the phone to Weinstein who threatened to kill Cimmino if he failed to deliver the real heroin. Cimmino testified that he later called Moore and complained to him about Weinstein's threat and that Moore apologized, but said that the phony heroin deal hadn't worked, and that he should produce real heroin. Cimmino admitted that, out of fear for his life and the lives of his family, he had sold heroin to Moore and Weinstein.

### I

Cimmino, who was convicted on all seven counts of the indictment, raises two questions in his appeal. The defense of entrapment as a matter of law was urged upon the trial court and is reasserted here. Cimmino also argues that he was sentenced under the wrong statute. Because appellant Cardi raises the same issue, we reserve the sentenc-ing question for discussion at the end of this opinion.

Concerning the entrapment defense, we hold that the trial judge properly submitted the question to the jury. The Supreme Court ruled in Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), that where the evidence of entrapment is controverted "the issue of whether a defendant has been entrapped is for the jury as part of its function of determining the guilt or innocence of the accused." *Sherman,* 356 U.S. at 377, 78 S.Ct. at 823.

Cimmino argues that although the "issue of entrapment is generally a question of fact for the jury," the evidence in this case was of such a nature as to require a court determination that Cimmino was entrapped as a matter of law. Relying on *Sherman,* where the Supreme Court did find the entrapment as a matter of law existed, Cimmino argues that it was error to give the issue to the jury. We do not agree.

In Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932), the Supreme Court drew the crucial distinction in entrapment cases between ensnaring an innocent citizen in a government conceived and instigated plan for the perpetration of an illegal act and "merely afford[ing] opportunities and facilities" for the criminally predisposed to act. *Sorrells,* 287 U.S. at 441, 53 S.Ct. 210. See also United States v. Haden, 397 F.2d 460, 466 (7th Cir.1968). Predisposition is the determinative factor where, as here, it is conceded by the Government that the criminal scheme originated with its agents. As is often the case, proof relative to the predisposition question was contradictory and in the final analysis reduced itself to a question of witness credibility. That in turn must be weighed and resolved by the jury.

Appellant's reliance on *Sherman* for the proposition that the trial court committed error in not finding entrapment as a matter of law is clearly mis-

placed. The Court carefully pointed out in *Sherman:*

> In so holding, we are not choosing between conflicting witnesses, nor judging credibility. . . . We reach our conclusion from the undisputed testimony of the prosecution's witnesses. *Sherman,* 356 U.S. at 373, 78 S.Ct. at 821.

Therein lies the difference between this case and *Sherman,* for here the evidence that Cimmino readily agreed to engage in the criminal enterprise and later sought to increase its volume was sufficient to justify giving the case to the jury. The fact that Cimmino's testimony disputed the Government's evidence of willingness or predisposition merely makes it a credibility question.

## II

Appellant Cardi urges numerous grounds for reversal. First, he contends that the only evidence which connects him with Cimmino in the alleged conspiracy is the September 23, 1970 conversation in which Moore related how Cimmino had "burned" them with flour instead of heroin. It is contended that Cardi's response, "If it was anybody but you, I wouldn't talk to you about the stuff. But I will check into it and do whatever can be done. You'll get it," was not sufficient to support a finding that Cardi knowingly and willfully joined a conspiracy to violate the narcotics laws. We think differently.

██ In resolving the question we must determine whether all the evidence when viewed in the light most favorable to the Government and considering the jury's right to weigh the evidence, determine credibility, and draw justifiable inferences, could fairly support a verdict of guilt beyond a reasonable doubt. Applying this standard, we find sufficient evidence in the record upon which the jury could reasonably have inferred a conspiracy between Cardi and Cimmino. Both Government agents testified that during their September 23 conversation with Cardi, in which they complained about the flour Cimmino had given them instead of heroin, they told him of their dealings with Cimmino and that he responded:

> I said, "Dickie, I want to talk to you about Virgil." He said, "Sure, what is it?" I said, "Well, you know we are doing business with him buying stuff." He said, "Stuff?" I said, "Yes, heroin. He burned us. He gave us four ounces of flour or something and took $4,400 last night for it."
>
> Q. Did he respond to that?
>
> A. Yes, sir. Cardi said, "If it was anybody but you, I wouldn't talk to you about the stuff." He said, "But I will check into it and do whatever can be done." I said "Thanks, I really need the stuff." He said, "You'll get it." I left. . . .

Immediately following this conversation, Cimmino phoned Moore and Weinstein and told them "you're going to get your stuff, Dickie is on my back." The heroin was in fact delivered shortly thereafter.

██ Such evidence also satisfied the requirement that the government prove an individual defendant's participation in an unlawful conspiracy by his own words and actions and not those of other participants. United States v. Fellabaum, 408 F.2d 220, 226 (7th Cir.1969); United States v. Corallo, 413 F.2d 1306, 1324 (2d Cir.1969). We noted in United States v. Hickey, 360 F.2d 127, 138 (7th Cir.1966), "A conspirator need not participate in all the activities of the conspiracy, nor is it necessary that he become a member of the conspiracy at its inception . . : it is only necessary that he knowingly contribute his efforts in furtherance of it." The evidence was, therefore, legally sufficient, if believed by the jury, to support a finding of guilty on the conspiracy count.

██ In so holding we expressly reject the argument that it was improper to infer Cardi's participation in a conspiracy from the single transaction proved

here. Citing United States v. Stromberg, 268 F.2d 256, 267 (2d Cir.1959), and United States v. Reina, 242 F.2d 302 (2d Cir.1957), Cardi argues that the single isolated transaction whereby he facilitated the first sale is insufficient to justify the inference of participation in a conspiracy. *Stromberg* and *Reina* both reversed conspiracy convictions where the defendant's involvement with an established conspiracy was limited to a single transaction. Superficially these cases would seem to control here; they are, however, distinctly different. In both cases, the evidence failed to establish that the defendants who engaged in a single illegal transaction with an established conspiracy "knew or accepted the conspiratorial aims." That is not the situation here where the testimony of both agents indicates that Cardi was told about the narcotics transactions among Cimmino, Moore and Weinstein and voluntarily offered to intervene and facilitate one such transaction. It is Cardi's knowledge of the transaction between Moore and Cimmino and his willingness to facilitate it that distinguishes this case from *Stromberg* and *Reina*. A single act may be sufficient "to draw a defendant within the ambit of a conspiracy" where the act is such "that one may infer from it such an intent (to participate in an unlawful enterprise) or the Government submit[s] independent evidence that the defendant knew of the conspiracy and associated himself with it." United States v. Bentvena, 319 F. 2d 916, 927–928 (2d Cir.1963); Ingram v. United States, 360 U.S. 672, 680, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959); United States v. Aviles, 274 F.2d 179, 189 (2d Cir.1960).

■ Further, it is not necessary that a defendant have knowledge of each and every detail of a plan or conspiracy; it is enough when he knows its essential nature. United States v. Fellabaum, 408 F.2d at 224. The jury could legitimately infer from Cardi's statement that he knew of the plan between Cimmino, Moore and Weinstein to sell narcotics and voluntarily assisted and facilitated

its accomplishment to the extent of the September 25 sale.

### III

With respect to Count III, charging the unlawful sale of narcotics on September 25, 1970, Cardi argues in the alternative that it was error to permit various hearsay declarations by Cardi and his coconspirators to be used against defendant Cardi, and that, even if admissible, the evidence was insufficient to establish guilt beyond a reasonable doubt. We disagree with both contentions.

■ Our holding that the evidence established a prima facie conspiracy in which Cardi knowingly partook, at least so far as the September 25 sale charged in Count III is concerned, disposes of appellant's arguments relating to the admissibility of Cardi's own statement and the Cimmino-Moore phone conversation. Once the conspiracy was established these statements were properly received against Cardi. Krulewitch v. United States, 336 U.S. 440, 453, 69 S.Ct. 716, 93 L.Ed. 790 (1949).

■ As to Cardi's challenge to the sufficiency of the evidence relating to Count III, we find that his statement to Moore that he would check into Cimmino's deception and that Moore would get his "stuff," coupled with Cimmino's uncontradicted statement that "Dickie is on my back," and the fact that Cimmino immediately thereafter delivered the heroin is sufficient evidence to support a conviction for the substantive offense.

### IV

Counts V and VII charge Cardi with substantive violations of 21 U.S.C. § 174 for the October 1 and 15 heroin sales. Cardi challenges the sufficiency of the evidence supporting his conviction on these counts asserting that even if the hearsay declarations discussed above were properly admitted there was no evidence to connect him with the sales. We agree.

 As we have noted above, Cardi's participation in the conspiracy to sell drugs was established only so far as the September 25 sale was concerned. The conspiracy, so far as Cardi was concerned, ended at that time. The evidence of the conspiracy could not properly be used to support a conviction on the later sales. In addition, none of the evidence relating to the October 1 and 15 sales implicated Cardi in any manner. The government's proof established that Cimmino and Moore arranged for these sales and that Cimmino's source was a man named Carioscia, not Cardi. The record is barren of any evidence showing that Cardi participated in or facilitated these sales as he did the September 25 sale. Indeed, there is no evidence that Cardi even had knowledge of these sales. The Government's attempt to prove Cardi's participation and knowledge by the recorded telephone conversation between Cimmino and Moore (footnote 2) is unconvincing. A fair reading of that confusing statement renders it more exculpatory than inculpatory so far as Cardi is concerned. It would appear from Cimmino's statements that Cardi, while not objecting to Cimmino's involvement with drugs, did not want to be associated with it. The only other evidence which conceivably could have been used to support conviction on these counts is testimony by Government surveillance agents that Cimmino and Micelli visited Cardi at his home on November 25, 1970. Such evidence, without some fact upon which the jury could legitimately infer that the sales in question were discussed, is completely insufficient to justify the guilty verdict. Accordingly, we hold that the trial judge erred in not directing a verdict of acquittal on Counts V and VII.

 Cardi contends that the indictment charging both conspiracy and substantive offenses based upon the same evidence represented an abuse of prosecutorial discretion because it was intended to impress the jury with multiple charges. While we agree that in certain instances multiple charges based upon the same conduct may be prejudicial to a defendant's right to a fair trial, we do not believe such was the case here. It was proper for the Government to charge Cardi with conspiracy while at the same time charging him with substantive crimes arising out of the overt acts. The substantive offenses did not merge into the conspiracy, Pinkerton v. United States, 328 U.S. 640, 643, 66 S.Ct. 1180, 9 L.Ed. 1489 (1946), and the number and nature of the charges here cannot be said to have been designed to overwhelm the jury.

## V

Both Cardi and Cimmino were convicted and sentenced under 21 U.S.C. § 174 and 26 U.S.C. § 7237. Cardi was sentenced on October 29, 1971 to serve a total of ten years in prison: five years on the conspiracy count and, consecutive thereto, three concurrent five year sentences on each of the substantive counts. Cimmino was sentenced on the same day to a similar sentence with his six five year sentences on the substantive counts to run concurrently but consecutively to the sentence on the conspiracy count. Under 26 U.S.C. § 7237(d) neither appellant was eligible for suspension of sentence, probation, or parole.

In October 1970 Congress repealed sections 174 and 7237(d) and replaced them with the Comprehensive Drug Abuse Prevention and Control Act of 1970. This Act, which took effect six months before appellants' trial, contains no provision for a mandatory minimum sentence or exemption from the suspension of sentence, parole and probation provisions of 18 U.S.C. § 4208 as did section 7237(d).

Relying on the new provisions both Cardi and Cimmino filed motions to be resentenced under the new Act. The motions were denied and appeals were taken. Those appeals have been consolidated with the appeals from the original convictions and are therefore considered here.

 It is appellants' contention that neither the "savings clause" of the new

Act, section 1103(a) nor the general "savings clause" of the Federal Statutes, 1 U.S.C. § 109, mandate sentencing under the old Act because they refer only to "prosecutions" for violations occurring prior to the effective date of the new Act.[3] It is their theory that the word "prosecutions" refers only to the proceedings up to and including the verdict and judgment thereon. Sentencing would, therefore, be outside the savings clause allowing defendant charged under the old Act but not sentenced until after the adoption of the new to be sentenced under the new Act.

At the time the parties filed their briefs in this appeal, a conflict existed between this circuit and the First Circuit as to the availability of suspended sentences, paroles or probations under section 4208. This court held in United States v. McGarr, 461 F.2d 1 (7th Cir.1972), that although the penalty provisions of the old Act requiring a five-year minimum sentence was "saved," the prohibition against suspended sentences, parole and probation was not. The First Circuit took the opposite position in Bradley v. United States, 455 F.2d 1181 (1st Cir.1971). The Supreme Court granted certiorari in *Bradley* and has recently resolved the question of the availability of the sentencing alternatives of section 4208 adversely to appellants. Bradley v. United States, 410 U.S. 605, 93 S.Ct. 1151, 35 L.Ed.2d 528 (1973).

In *Bradley,* the Court held:

Section 1103(a) clearly makes parole unavailable under the latter provision. [18 U.S.C. § 4208(a).] As we have said, sentencing is part of the prosecution. The mandatory minimum sentence of five years must therefore be

imposed on offenders who violated the law before May 1, 1971. And Congress specifically provided that § 4208(a) does not apply to any offense "for which there is provided a mandatory penalty." Pub.L. 85–752, § 7, 72 Stat. 847 (1958). In any event, the decision to make early parole available under § 4208(a) must be made "[u]pon entering a judgment of conviction," which occurs before the prosecution has ended. Section 1103(a) thus means that the District Judge cannot specify at the time of sentencing that the offender may be eligible for early parole.

We therefore reject appellants' contention that they were improperly sentenced.

For the reasons stated, the convictions of appellant Cimmino are affirmed on all counts. As to appellant Cardi, they are affirmed on Counts I and III and reversed on Counts V and VII.

---

3. The "savings" clauses involved provide: Public Law 91–513, § 1103, "for any violation of law occurring prior to the effective date of Section 1101 shall not be affected by the repeals or amendments made by such section . . . or abated by reasons thereof;" 1 U.S.C. § 109, "The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability. . . ."