UNITED STATES of America, Appellee,

v.

Harry STROMBERG, Henry Teitelbaum, Jean Aron, Nathan Behrman, Martin De Saverio, George Brisbois, Herman Samnick, Benjamin Danis, Saul Snyder, Salvatore Maimone, Anthony Mirra, Steve Puco, Daniel Lessa, Nicholas Lessa and Leo Seto, Defendants-Appellants.

No. 214, Docket 25188.

United States Court of Appeals Second Circuit.

Argued Feb. 4, 1959.

Decided June 15, 1959.

Samuel Mezansky, New York City (Moses Polakoff and Sheldon Lowe, New York City, on the brief), for defendant-appellant Harry Stromberg.

Daniel H. Greenberg, New York City (Max Fruchtman, New York City, on the brief), for defendant-appellant Henry Teitelbaum.

Joseph Leary Delaney, New York City, for defendants-appellants Jean Aron and Anthony Mirra.

Maurice Edelbaum, New York City (Chester E. Kleinberg, New York City, on the brief), for defendant-appellant Nathan Behrman.

Frederick B. Boyden, New York City, for defendant-appellant Martin De Saverio.

George Feit, New York City, for defendant-appellant George Brisbois.

Irwin Klein, New York City (Albert H. Ruppar, New York City, on the brief), for defendant-appellant Herman Samnick.

Henry K. Chapman, New York City (Murray E. Gottesman, New York City, on the brief), for defendant-appellant Benjamin Danis.

Edward H. Levine, New York City (Vernon C. Rossner, New York City, on the brief), for defendant-appellant Saul Snyder.

Moses L. Kove, New York City, for defendant-appellant Salvatore Maimone.

James J. Hanrahan, New York City, for defendant-appellant Steve Puco.

Samuel W. Altman, New York City, for defendant-appellant, Frank Pasqua.

Henry K. Chapman, New York City, for defendants-appellants Daniel and Nicholas Lessa.

Moses Polakoff, New York City (Samuel Mezansky, New York City, on the brief), for defendant-appellant Leo Seto.

George I. Gordon and Mark F. Hughes, Jr., Asst. U. S. Attys., Southern District of New York, New York City (Arthur H. Christy, U. S. Atty., New York City, Herbert F. Roth, Astoria, N. Y., Kevin Thomas Duffy, Otis Pratt Pearsall, Alan W. Richenaker, and Gideon Cashman, Asst. U. S. Attys., S. D. N. Y., New York City, on the brief), for the United States.

Before SWAN, Circuit Judge, MADDEN, Judge, United States Court of Claims,* and HINCKS, Circuit Judge.

HINCKS, Circuit Judge.

Fifteen defendants in this case appeal from judgments of convictions entered against them upon a jury verdict. The indictment, in a single count, charged forty-six defendants and sixteen others under 18 U.S.C.A. § 371 with conspiring to violate 18 U.S.C.A. § 212 (bribery of customs officials), 21 U.S.C.A. §§ 173, 174 (narcotics laws) and to defraud the United States of its right to have the Customs Service administered free from corruption.

Before the trial, two defendants entered guilty pleas. The Government consented to the motions of three defendants for severance and itself moved for severance as to eleven more. Another eleven are fugitives from justice or unidentified. The remaining nineteen were tried together, although a number of them made timely motions for separate trial. The opinion of Judge Palmieri,. D.C., 22 F.R.D. 513, deals in part with the severance motions, as well as with other pretrial motions. At the end of the Government's case, a judgment of acquittal was directed by the court in favor of one defendant. The jury returned verdicts of guilty against the other eighteen, and fifteen are now before us on appeal.[1]

At the trial, the Government's case depended principally upon the testimony of three witnesses. The first of these, one Lafitte, a Government employee and informer, testified to conversations with a number of the alleged conspirators during the first part of the conspiracy; the whole conspiracy, the indictment charged, continued from 1950 to 1956. In July, 1952, Lafitte met one Aron,[2] who ran several corporations and maintained offices in New York City. Through Aron, Lafitte met a number of the defendants named in the indictment: Gelb,[3] LaBonte,[3] Baruche,[3] and Brisbois[2] whom Aron described as his Canadian representative. This group met frequently at lunch, dinners and at Aron's office; their conversations, according to Lafitte, frequently involved the narcotics trade. In one of these conversations, Gelb told Baruche he was paying too much for heroin in France. There was also discussion of a transaction "with the Boston people" in which $80,000 had been lost; it was generally agreed that a trip to Boston was necessary because the Boston people "would have to be straightened out." Also, the purchase

---

* Sitting by designation pursuant to the provisions of 28 U.S.C. § 291(a).

1. One defendant, who received a suspended sentence, did not appeal; another died before his appeal could be heard; and on the appeal of a third, the Government confessed error.

2. A defendant-appellant.

3. A defendant, not on trial below.

of a coalyard in Boston was under consideration, through which narcotics might be smuggled. Finally, in November, 1952, Aron and Lafitte went to Boston with two others, not accused in the indictment: Gelb did not go because too closely identified with traffic in narcotics. In Boston, they met Brisbois, Moffie,[3] and Bucelli[4] and there was general discussion relating to the smuggling of narcotics. It appeared from the conversations that narcotics had already been smuggled through a Boston coalyard. The success of these further negotiations with the Boston group does not appear in the testimony. Shortly thereafter, however, Aron and Lafitte returned to New York. There the social contacts between Lafitte and Baruche, Gelb and Aron continued. Upon one occasion, Lafitte met Behrman,[2] whose name figures largely in the alleged conspiracy in its later stages. He also testified that he met Samnick[2] and Danis,[2] Customs Inspectors, upon various occasions, in the company of Aron, Gelb and Baruche; and each made a remark about the ease of smuggling goods through Customs. Aron described Samnick to Lafitte as "one of his Customs men." And the active assistance of Customs Inspectors was used as a talking point by Baruche in attempting to persuade Lafitte to join them in the narcotics business. Lafitte chose to remain unpersuaded, however; and, after he had reported his findings to the Government, some time early in 1953, it was apparently thought advisable to let his contact with the Aron group lapse.

Several aspects of Lafitte's testimony were corroborated by minor witnesses not named as defendants. Montfiore testified of dealings with Aron frequently after 1949, at the time when Aron was engaged in importing resistors for television tubes; that in Aron's office, he frequently saw Gelb, Baruche, Danis and Samnick; and that Aron told him that the Customs Inspectors were useful to him in avoiding red tape in getting in resistors by air. He testified further that although Aron said, once, that he owed Samnick and Danis money, he never saw any money passed; but did once see a postdated check, which Aron said was for Samnick. Also that Aron had in 1952 or 1953 described a transaction between Gelb and Baruche in which "Gelb had taken $30,000 from Baruche," Aron remarking that he was "very glad he was out of it."

One Adatto, a nephew of Baruche's who worked for Aron, corroborated the fact that Samnick and Danis were often in Aron's office; he testified that he once sought Samnick's help to expedite the entry of some electronic material for Aron and that he once took part in transferring funds from Gelb and Aron to Baruche in Europe through several Swiss bank accounts.

Finally, one Brenner, Aron's secretary, testified to frequent visits at Aron's office by Gelb, Baruche, Samnick and Danis.

After the period covered by Lafitte's testimony, which described events up to the end of 1952, evidence of the conspiracy breaks off until the end of 1953, when James Ewing, the second major prosecution witness, appeared on the scene. Ewing, himself a dealer in narcotics in Detroit, began to buy narcotics in New York from Vellucci,[5] delivered to him by Tedesco.[5] In answer to a complaint that the narcotics supplied were overly diluted, Vellucci said, according to Ewing, that he was going to deal with the "mob around 50th and Broadway." Aron's office, at this time was at 49th St. Somewhat later, Ewing testified, Vellucci began to purchase from Behrman and Gelb, to whom Ewing was introduced. He testified to one purchase in which the money he paid Vellucci was passed directly on to Gelb.

In March, 1954, Gelb was arrested by Federal Narcotics Agents. Government agents testified to the discovery of huge

---

2. A defendant-appellant.

4. A defendant who died pending his appeal.

5. A named coconspirator, not a defendant.

amounts of narcotics in two apartments used by Gelb where there was also discovered a letter from Baruche to Gelb. And the landlord at one of the apartments testified that Behrman was a frequent caller. According to one witness, Behrman was also seen at Federal Detention Headquarters talking to Gelb, after Gelb's arrest; and there was evidence that a letter was passed, by another witness, from Behrman to Baruche.

The arrest of Gelb and the seizure of the huge cache of narcotics, Ewing testified, made it necessary for Vellucci and Behrman to raise from another source at least $50,000 to pay for a shipment of narcotics shortly to arrive from France. Ewing testified that to meet this need they obtained the aid of Stromberg,[2] who advanced them money; that later repayments were made on several occasions, varying in amount from $10,000 to $25,000; that present at these meetings was Teitelbaum,[2] who was a constant companion of Stromberg; that the money obtained from Stromberg was delivered to "Gene's [Baruche's] partner's house"; that he, Ewing, accompanied the deliverer to 39 E. 78th Street, a building in which Aron's apartment was also located, and that after the shipment of narcotics arrived Stromberg was paid off, in installments. According to Ewing, Stromberg continued to finance the imports and once agreed to take steps to settle a jurisdictional dispute with another distribution ring; on one occasion in Ewing's presence money was paid by Vellucci to Teitelbaum for delivery to Stromberg; and after consultation with Stromberg and Vellucci, Behrman made the arrangements with Baruche, the European supplier, passing on to him complaints about the quality of narcotics, and, on one occasion, going to Europe himself.

Ewing testified that Vellucci told him, "We have Customs men paid off," and that Vellucci handled the distribution in New York. In the summer of 1954, Ewing's relationship with Vellucci became closer: while carrying on the distribution of narcotics in Detroit, through agents, he nonetheless managed to spend a great deal of time in New York. He began driving for Vellucci and was present at a number of meetings with retailers, including De Saverio,[2] the Lessa brothers,[2] Puco,[2] Seto,[2] and Di Palermo,[3] at which orders were placed and cash, for earlier deliveries, was received. In June or July of 1955, Ewing met Baruche, who had come to the United States in answer to complaints that one shipment of heroin was bad. When the shipment was tested and found bad, in the presence of Vellucci and Behrman, Baruche agreed to bear the expense of replacement.[6] In August of 1955, Ewing was summoned to New York from Detroit by Vellucci; they drove to Hoboken, where they met a Customs Inspector, identified by Ewing as Snyder,[2] who delivered to them two suitcases. Vellucci told Ewing that the suitcases contained heroin; and shortly thereafter, Ewing was paid off for his help, in heroin.

Several aspects of Ewing's story were corroborated by other witnesses. Hart, a woman living with Ewing during the period, testified that she had received a number of deliveries of heroin from Tedesco, Vellucci's agent. And both she and Frank, a Detroit police officer in Ewing's pay, corroborated Ewing's account of a trip to New York and a meeting with Vellucci during which Vellucci showed Ewing how to test cocaine.

The last principal Government witness was one Basile, a narcotics retailer. His testimony related mainly to his source of supply, Di Palermo, whose business was operated in a candystore at 46 Prince Street. A Narcotics Agent testified that he had followed Vellucci and Behrman, in October, 1955, to the same address. Basile testified that he and his partners, Yacono[3] and Maimone,[2] had

---

2. A defendant-appellant.

3. A defendant, not on trial below.

6. It was shown that Baruche was registered at a New York hotel from July 22–29, 1955.

been supplied with both cocaine and heroin by Di Palermo; that one Greenberg[3] offered to introduce him to Behrman, who would sell him heroin for $7,500 a kilo, which was less than he was then paying Di Palermo; that when apprised of this competition, Di Palermo agreed to sell to him, Basile, for $7,000 a kilo, if Basile would buy in quantity, admitting that Behrman was his source. According to Basile this course of dealing continued without incident, except when a delivery of narcotics at about the beginning of September proved to be inferior. Di Palermo then told him "it's Natie Behrman's goods, its got to be o. k." Somewhat later, Basile talked to Behrman and Vellucci, who said they had "got hit with a bad batch." On one occasion, Basile saw Di Palermo turn over money to Vellucci. Basile also implicated Mirra[2] and Paradise,[3] who regularly bought narcotics from him.

Upon this evidence, the Government maintains that a single conspiracy, as charged in the indictment, was properly found by the jury and that the convictions must be upheld. More specifically, it urges that Aron and Baruche, operating behind the façade of a legitimate importing business, were the central figures in a syndicate engaged in importing narcotics into this country. The Government maintains that Baruche served as the purchasing agent of narcotics in France throughout the life of the conspiracy; Samnick and Danis, working through Aron, assisted the combine in smuggling narcotics into the country through New York; Bucelli handled the Boston branch of the smuggling operation; Brisbois distributed narcotics through Canada; and Gelb financed the group's activities and handled the New York distribution. This was the opening phase of the conspiracy which, the Government maintains, was established by the testimony of Lafitte. Subsequent importing and distributing operations were part of the same continuing conspiracy enlarged to include additional members.

Thus, after Gelb's arrest, Stromberg became the financier and Vellucci and Behrman became the chiefs of the distributing apparatus. The testimony of Ewing and Basile, it is argued, ties in the other defendants as links in the conspiratorial chain in the later period.

The appellants' main defense consists of an attack on the Government's assertion that a single and continuing conspiracy was proved. They point to the time gap, between December, 1952, when Lafitte's testimony ends, and December, 1953, when Ewing's begins. In this contention, they rely principally upon United States v. Russano, 2 Cir., 257 F.2d 712.

■■ It is true that many of the actors in the group described by Lafitte are not seen again after December 1952: Brisbois, Bucelli, Samnick and Danis do not reappear, and the evidence connecting Aron to the later period is slight. The links mainly relied upon by the Government are Baruche, Gelb and Behrman. We think Behrman's one reported appearance at Aron's office is hardly strong enough to tie him to the conspiracy before 1953; but Baruche and Gelb were both central participants in each phase, until Gelb's arrest in early 1954. In United States v. Russano, supra, there was some positive evidence that the first conspiracy had ceased between 1952 and 1955, when the second commenced. We find no parallel evidence here: Gelb and Baruche's activities, central to both phases, were exactly the same after the gap in testimony as before, and no intervening change was shown. See United States v. Liss, 2 Cir., 137 F.2d 995, certiorari denied 320 U.S. 773, 64 S.Ct. 78, 88 L.Ed. 462. A conspiracy, once established, is presumed to continue until the contrary is shown. United States v. Cohen, 2 Cir., 145 F.2d 82, certiorari denied 323 U.S. 799, 65 S.Ct. 553, 89 L.Ed. 637; Hyde v. United States, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114; Poliafico v. United States, 6 Cir., 237 F.2d 97, certiorari denied 352 U.S. 1025,

---

**2.** A defendant-appellant.

**3.** A defendant, not on trial below.

77 S.Ct. 590, 1 L.Ed.2d 597; Marino v. United States, 9 Cir., 91 F.2d 691, 113 A.L.R. 975. We hold there was sufficient evidence to go to the jury as to the existence of a single continuing conspiracy.

■ This conclusion is not invalidated by the absence of evidence to show that some of the "New York members" of the alleged conspiracy, including the Customs officers, knew of the existence of the "Boston members" or their operations in Boston or Canada, and vice versa. For this is not the case of a "circle conspiracy"[7] such as was involved in Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557, or of a single transaction such as in United States v. Peoni, 2 Cir., 100 F.2d 401. Here the evidence plainly supported a "chain" type conspiracy[7] such as was involved in Blumenthal v. United States, 332 U.S. 539, 556–557, 68 S.Ct. 248, 92 L.Ed. 154; United States v. Bruno, 2 Cir., 105 F.2d 921, reversed on other grounds 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257; United States v. Cohen, supra; United States v. Rich, 2 Cir., 262 F.2d 415; United States v. Carminati, 2 Cir., 247 F.2d 640, certiorari denied 355 U.S. 883, 78 S.Ct. 150, 2 L.Ed.2d 113; United States v. Tramaglino, 2 Cir., 197 F.2d 928, certiorari denied 344 U.S. 864, 73 S.Ct. 105, 97 L.Ed. 670. For here there was evidence of a core of conspirators (Aron, Baruche and Gelb)[8] who were buying, importing, and distributing narcotics for sale in large quantities in successive transactions. As the cases above cited show, from such evidence it might rationally be inferred that one joining such a conspiracy knew that it had a scope and that, for its successful operation, it required a widespread organization, more comprehensive than may have been disclosed by any con-

tact or transaction of which he had knowledge through his actual personal participation. Thus activities by Boston conspirators in Boston were not outside the scope of the conspiratorial agreement merely because not shown to have been specifically known to certain of the New York conspirators, and vice versa. Each defendant, once found to be a member whatever the level of his participation may have been, might be found intentionally to have contributed to the success of the overall conspiracy.

■ The appellants also contend that the convictions should be reversed because obtained in "a mass trial" in which so many defendants were involved that, especially in view of the complex issues and the volume of evidence received "subject to connection,"[9] the jury could not properly evaluate and apply the evidence to the individual defendants. Here too we disagree. In so holding, we do not rest upon the fact that the mere number of defendants on trial, or of alleged conspirators involved, was no greater than in other cases in which convictions have been affirmed, such as the Bruno and Cohen cases, cited above. United States v. Falcone, 2 Cir., 109 F.2d 579, affirmed 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128. Nor do we think it determinative that no abuse of discretion was shown in denying below pretrial motions for severance. We place our holding squarely on the fact that, in the context of this trial, nothing in the issues, the evidence or the rulings warrants a conclusion that the number of the defendants prevented the jury from appraising the independent evidence against each defendant and meting out individual justice under the law.

Broadly viewed, the Government's case rested on the testimony of three witnesses, Lafitte, Ewing and Basile, whose

---

7. 57 Columbia Law Rev. 387, 390.

8. There was substantial evidence that after Gelb's arrest his functions in the conspiracy were taken over by Stromberg and Vellucci.

9. Principally, evidence of the acts and dec-

larations of alleged coconspirators which according to the judge's ruling was not to be considered against a particular defendant unless he were found by independent evidence to be a member of the conspiracy.

credibility was vigorously assailed by the defendants. Surely it was not beyond the capacity of the jury to decide whether these witnesses were to be believed. And once it was determined that these witnesses were to be believed and that the acts and declarations of the defendants and their alleged coconspirators, to which these witnesses had testified, had indeed been made, we think it by no means a task of insuperable difficulty for the jury to comply with the judge's instructions [10] and determine as to each defendant the issue of membership in a single continuing conspiracy on the basis of the independent evidence—i. e., the evidence as to his own acts and admissions.

There was nothing particularly complicated about the independent evidence which connected each defendant to the conspiracy. Its application involved the usual jury task of collating the separate items of independent evidence relating to each defendant and determining whether in sum total it warranted the inference of membership. To be sure, because of the number of the defendants and the exigencies of trial the several items of direct evidence relating to a particular defendant were interspersed throughout a record comprehensive enough to cover all. But even if it might have taxed the capacity of a jury single-handed, with memory of the evidence unrefreshed, to filter out and collate the several items of evidence relating to the connection of each defendant, this jury had the aid of a summary of such evidence given by the judge in his charge. Notwithstanding the number of defendants, we are confident that aided by the judge's charge the jury had in mind the evidence unconditionally received against each defendant which linked him with the conspiracy.

It is true, that in addition to the independent evidence of the acts and declarations of the individual defendants, there were before the jury, subject to connection, numerous incriminating hearsay declarations of coconspirators which under the judge's charge were competent only against such defendants as were found by the jury to be linked to the conspiracy by independent evidence and only if made in the furtherance of the conspiracy. The appellants contend that with so many defendants

---

10. The judge charged:

"In your consideration, then, of the evidence you should first determine whether or not the conspiracy to import and distribute existed as charged in the indictment. If you conclude that such conspiracy did exist, you should next determine as to each defendant separately whether or not he or she was a party to or member of the conspiracy with knowledge of its illegal purpose and with the intention to assist the conspiracy to achieve its illegal objective.

"In considering whether or not a particular defendant was a member of the conspiracy, you must do so without regard to and independently of the statements or declarations of others. That is to say, you must determine the issue as to his or her membership in the conspiracy from his or her own statements or declarations or acts or conduct.

"If and when the existence of the conspiracy charged in the indictment and the membership or any or all of the defendants in such conspiracy has been found, then the acts done and the statements or declarations made by any person found by you to be a member of the conspiracy may be considered in connection with the case as to any defendant whom you find to have been a member of the conspiracy even though such acts and declarations may have been made in the absence and without the knowledge of such defendant, provided such acts were done and such statements or declarations were made during the continuance of such conspiracy and in furtherance of an objective or purpose of the conspiracy.

"So, if you conclude from the evidence that a defendant was a member of the conspiracy and you do so based upon the independent evidence, as I have already told you, based upon his own acts or her own acts or her declarations, or her or his conduct, you may then consider as if made by him or her any statements or declarations of other members of the conspiracy, even though they are not named as defendants in the indictment, provided such statements or declarations were made during the existence of the conspiracy and in furtherance of an object or purpose of the conspiracy as charged in the indictment."

on trial the jury could not keep these two categories separate. But as Judge Hand pointed out in United States v. Dennis, 2 Cir., 183 F.2d 201, 230–231, affirmed on other grounds 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137, it was, at least under the preferred doctrine, a preliminary question for the judge to decide as to each defendant whether, if the Government's witnesses were believed, he and the various declarants were engaged in a common conspiracy which the declarations helped to realize: it was for the jury on all the evidence "to decide whether they believed the witnesses beyond a [reasonable] doubt." In this view of the law, if the judge, taking the testimony of the Government witnesses as true, decides that a given declarant and a given defendant were engaged in a common conspiracy, which the declarations helped to realize, the declarations of the coconspirators are left "to the jury to use like any other evidence * * *" And there is no need for the jury "to keep their minds in isolated compartments" as would be the case if the preliminary question were left to the jury. See also Glasser v. United States, 315 U.S. 60, 74, 62 S.Ct. 457, 86 L.Ed. 680; United States v. Pugliese, 2 Cir., 153 F.2d 497; United States v. Compagna, 2 Cir., 146 F.2d 524, certiorari denied 324 U.S. 867, 65 S.Ct. 912, 89 L.Ed. 1422. Accordingly, once the judge by his denial of motions for judgments of acquittal made at the close of the Government's case had himself decided the preliminary question as to whether the declarations of coconspirators in the execution of the conspiracy had been connected under the rule of the Dennis and Pugliese cases, there was no need for the jury to keep the evidence of declarations conditionally received in "isolated compartments" of their minds.

■ Here, as Judge Hand suggested in his opinion in the Dennis case, the charge was overly favorable to the defendants. For the judge, by denying the motions for acquittal, himself decided as to each defendant the preliminary question of connection to the conspiracy by independent evidence.[11] Yet he instructed the jury that only if it also decided the preliminary question adversely to a defendant could it proceed to consideration of the ultimate issue of his guilt beyond a reasonable doubt on all the evidence. The error, since in favor of the defendants, is of course not ground for reversal.

■ Moreover, we must not lose sight of the fact that the difficulties which the appellants envisage stem from the number of conspirators rather than the number of defendants on trial. The same evidence would have been admissible similarly subject to connection and the same problems would have arisen if each of the appellants had been tried separately. In the one situation as in the other, the number of conspirators would have been the same. United States v. Carminati, supra. And of course conspirators are not entitled to immunity merely because there number is great. United States v. Cohen, supra; Kotteakos v. United States, supra. Indeed, broadly considered, the large conspiracies are potentially more dangerous than the small ones.

■ The foregoing holdings, however, do not finally dispose of the objections of a number of the individual defendants that the evidence was insufficient to support a finding that each was a member of the conspiracy. Most of these objections are directed at the credibility of the principal Government witnesses. In so far as this is the case, they will be disregarded, for of course it is not the function of an appellate court to redetermine controverted issues already decided by the jury. Cramer v. United States, 325 U.S. 1, 65 S.Ct. 918, 89 L.Ed. 1441;

11. That the judge properly exercised his function in this respect is demonstrated by the judgment of acquittal of the defendant Lewis granted at the close of the Government's case. The judgment was granted on the express ground that there was insufficient independent evidence to connect Lewis with the conspiracy.

United States v. Markman, 2 Cir., 193 F.2d 574; United States v. Compagna, supra; United States v. Manton, 2 Cir., 107 F.2d 834, certiorari denied 309 U.S. 664, 60 S.Ct. 590, 84 L.Ed. 1012. But it is incumbent upon us to examine contentions that even if the Government witnesses are believed the independent evidence connecting each defendant with the conspiracy is insufficient to sustain his conviction. Glasser v. United States, supra.

 As to the appellants Samnick and Danis, we are unable to find evidence which warranted submission to the jury. Much of the evidence relating to them was hearsay: Lafitte testified that Aron described each as one of his Customs men, but not in their presence; a check, drawn by Aron payable to cash was said by him to be for Samnick, again not in his presence. Each, to be sure, was frequently in Aron's office and was frequently entertained; and Samnick, upon at least one occasion, was called to expedite the entry of resistors for Aron's apparently legitimate importation business. But mere association with conspirators is insufficient basis for a finding of participation. United States v. Di Re, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210; Aikens v. United States, 98 U.S. App.D.C. 66, 232 F.2d 66; United States v. Moloney, 7 Cir., 200 F.2d 344. The only proof which could possibly be considered independent evidence of participation consists of the statements, one by each of these two defendants, made to Lafitte.[12] As to one of these statements, it is not clear that the subject-matter was narcotics rather than resistors. And each might not unreasonably be construed only as hypothetical comment: after all, there was no evidence whatever that either Samnick or Danis had ever

actually used the smuggling technique which they mentioned. It may seem strange that narcotics conspirators should discuss such techniques at luncheon with friends not members of the conspiracy. But no inference unfavorable to these defendants may be drawn from this fact: Lafitte's own testimony shows that they discussed their nefarious business with him knowing that he was not a coconspirator. As to these two defendants, the independent evidence was too slight to warrant the admission of hearsay declarations and too slight to submit to the jury. Their motions for a directed verdict should have been granted.

 We also think that the conviction of the appellant Snyder must be reversed. At the trial, it was stipulated that Snyder had been introduced to either Aron or Baruche in 1949, before the conspiracy began. Aside from this, which standing alone was insufficient to support a conviction, the only incident connecting Snyder with the conspiracy is the delivery of two suitcases, later found to contain heroin, to Vellucci and Ewing in Hoboken.[13] In United States v. Reina, 2 Cir., 242 F.2d 302, certiorari denied sub nom. Moccio v. United States, 354 U.S. 913, 77 S.Ct. 1294, 1 L.Ed.2d 1427 we held that participation in a single isolated transaction was an insufficient basis upon which to bottom an inference of continuing participation in a conspiracy. For aught that appears in this record, this was Snyder's only transaction with the group; under the reasoning of the Reina case, the evidence is insufficient to support the inference that Snyder knew or accepted the conspiratorial aims or that his participation went beyond the single transaction.

12. In response to Lafitte's statement that big packages of narcotics were difficult to get through Customs, Samnick is reported to have said: "By boat or by plane the best way to do it is to use two big suitcases." Danis, upon another occasion, is reported to have said that "if he wanted, he can go with a truck across."

13. Snyder's conviction rests upon the jury's acceptance of Ewing's identification of him and upon the jury's rejection of Snyder's very plausible alibi. But these are questions of fact, which, we have held, are not reviewable here. On the identification point, see Zammar v. United States, 8 Cir., 217 F.2d 223.

The appellants De Saverio and Seto also invoke the Reina decision. But the evidence against both of these appellants was not limited to a single transaction. As to De Saverio, Ewing testified to a conversation between De Saverio and Vellucci about the amount of money, $12,000, owed to Vellucci "for the balance of a kilo and part on a kilo that he had not paid for." Taking the conversation in context, we think that, in the light of the evidence of the amount of narcotics involved and the manner of payment, a jury might reasonably infer the two were discussing payment for more than a single sale and that both understood that the narcotics involved were bought for distribution at retail. Moreover, upon another occasion Ewing was present when De Saverio paid Vellucci money. This aspect of the case was fairly put to the jury by the trial judge's charge. And to Seto also, we think, the Reina decision is inapplicable. For Ewing testified to an order by Seto from Vellucci in the summer of 1954 and to a second order in May, 1955. And he described these as two of half a dozen transactions in all.

 De Saverio also insists that it was error for the judge to refuse a charge as to evidence relating to his attempted impeachment of Ewing's testimony against him. Ewing had testified that the transactions between Vellucci and De Saverio took place in De Saverio's club in 1954 and on cross-examination he had described the layout and furnishings of the club where the business between Vellucci and De Saverio was carried on. The defense called two former members of the club who testified to changes in the layout and furnishings made, they said, in the spring of 1955 and described the premises before and after the changes. Ewing's description, which purported to be that of the premises as existing in 1954, more nearly resembled, according to testimony of the defense witnesses, the premises as they were after the changes. To explain this apparent conflict the prosecutor on summation suggested that the conversations which implicated De Saverio might have occurred on a visit to the club in 1955 after the changes had been made, pointing out that there was no evidence that Ewing had not been there in 1955. To this the defense objected and, to bolster its attempt to impeach Ewing's testimony, De Saverio's counsel at the close of the Government's summations requested a charge that there was no evidence that Ewing had been in the club in 1955. It is the refusal so to charge that is now assigned as error. We think the claim of error is without substance. When the prosecutor's summation was interrupted by the objection, the judge said: "I don't think there was any evidence that they [Ewing and Vellucci] continued to go there [to De Saverio's club] in 1955." In his summary of the Government's case against De Saverio he called attention to Ewing's testimony that the visit to the club was in *1954*[14] and to the conflict between Ewing's testimony as to the visit in 1954 and his description of the club as it then existed, on the one hand, and the testimony of the defense witnesses, on the other. He instructed the jury that they must acquit De Saverio if they did not believe Ewing's testimony. And he instructed generally that it was for the jury to determine what the testimony was, not from the assertions of counsel but from their own recollection. We think that the defendant's rights were sufficiently guarded and that the issue was properly submitted to the jury without the requested charge as to the absence of evidence of any post-1954 visit. See United States v. Rosenberg, 2 Cir., 195 F.2d 583, 597–598, certiorari denied 344 U.S. 838, 73 S.Ct. 20, 97 L.Ed. 687.

The appellant Teitelbaum also objects that there was insufficient evidence to

14. Ewing placed the visit to De Saverio's club a week after his first meeting him in another bar. When asked as to the time of the first meeting, Ewing said: "I believe it was the summer of '53—'54." When pressed more closely he said: "The summer of 1954."

connect him with the conspiracy. Ewing testified that Teitelbaum was always present, with Stromberg, when Vellucci and Behrman met Stromberg for the purpose of discussing the financing of narcotics shipments. However, several of these conversations neither Teitelbaum nor Ewing were able to hear, since they remained at the bar while the others discussed business around a table some distance away. Nevertheless, Teitelbaum was present, although not a participant, during at least two other conversations dealing with narcotics. From these, the jury might fairly believe that Teitelbaum knew of the common plan. And there was testimony that he delivered a payment from Vellucci to Stromberg upon one occasion and that at the same time he discussed the purposes of the conspiracy with Vellucci. As to Teitelbaum, we hold that the jury's conclusion was warranted.

Other appellants also contend that the evidence was insufficient to support their convictions. Except as to Samnick, Danis and Snyder, we overrule this claim of error. We have reviewed the evidence against each and conclude that the sufficiency of the Government's proof was so plain that further comment on this claim of error will serve no useful purpose. We turn therefore, to consider claims of specific error.

The appellant Behrman and several others ascribe prejudicial error based upon Ewing's response to a question upon cross-examination. Ewing was being questioned as to his failure to mention Behrman's name in his testimony before the grand jury. The cross-examiner was pressing for a direct answer; the witness replied that he was unable to give one without an explanation. The judge ruled that he might answer and then explain. The witness then said: "No, I didn't mention his name in there because at that time I was not dealing with Nathan Behrman. *At that time Nathan was in jail."*

There can be no doubt that the testimony above italicized was inadmissible; and to Behrman at least, it was also prejudicial. However, the answer was unforeseeable: plainly it had not been induced by the prosecution. The judge immediately struck out the testimony and instructed the jury to disregard it, adding "You are to pay no attention to that remark in any way. You are to disregard it completely." And the incident was an isolated one during the course of a long trial. These considerations distinguish the case from United States v. Tomaiolo, 2 Cir., 249 F.2d 683, at page 695, where reversal was based on an accumulation of errors. We are of the opinion that in the setting of this case the prompt instruction to disregard the answer cured the error. United States v. Giallo, 2 Cir., 206 F.2d 207, affirmed 346 U.S. 929, 74 S.Ct. 319, 98 L.Ed. 421; United States v. Curzio, 3 Cir., 179 F.2d 380; see United States v. Apuzzo, 2 Cir., 245 F.2d 416, certiorari denied 355 U.S. 831, 78 S.Ct. 45, 2 L.Ed. 2d 43.

As is not unusual in an appeal from a fiercely contested and important trial, numerous claims of error are based on the conduct of the prosecutor. First, we will consider the prejudice claimed to have resulted from a public speech made [15] by the United States Attorney after the trial had begun in which he expatiated on the menace of organized crime. The speech was reported in at least two newspapers; in the New York Herald Tribune, it occupied a prominent place on the editorial page. As reported, the speech dealt with two major crime syndicates operating in New York and Chicago, alleged to have millions of dollars at their disposal to encourage activities in "gambling, racketeering and other illicit traffic * * *"; it was suggested that the Mafia was the connecting link

15. The speech was made on a prior invitation to address the alumni of a large law school not by the United States attorney who prosecuted the appeal but by his predecessor who took an active part in the trial.

between the syndicates and that one of the objects for which their financial power was used was "to influence and buy elected public officials and law-enforcement agents." Later in the article, the Federal Bureau of Narcotics was mentioned among the federal enforcement agencies which constituted an "important element in this campaign against organized crime." No reference was made to this case or to any of the defendants.

We think it unfortunate and undesirable for the prosecutor to make such a speech while conducting an important criminal trial. The effect may be so to stimulate outside pressures on the jury, through press and radio publicity, that a defendant's right to a fair trial may be impaired. Such pressures, even when not induced by the prosecutor, have sometimes been held to constitute sufficient ground for a new trial. See Delaney v. United States, 1 Cir., 199 F.2d 107, 39 A.L.R.2d 1300. But the problem here is not to state the preferred rule of practice, but rather with the aid of hindsight to assess the effect of the act upon this particular jury. See Delaney v. United States, supra; United States v. Allied Stevedoring Corp., 2 Cir., 241 F.2d 925, certiorari denied 353 U.S. 984, 77 S.Ct. 1282, 1 L.Ed.2d 1143. In this case, the trial judge, after determining that several of the jurors had seen the article, immediately admonished them to disregard it and not to discuss it with anyone so that "the trial does not become adulterated by anything outside which may affect the jury." Doubts have been expressed about the effectiveness of such judicial admonitions. See United States v. Leviton, 2 Cir., 193 F.2d 848, 865–867; United States v. Keegan, 2 Cir., 141 F.2d 248, reversed on other grounds 325 U.S. 478, 65 S.Ct. 1203, 89 L.Ed. 1745; Delaney v. United States, supra. However, the content of this article differed little from much contemporary writing in the press on the general subject of organized crime and law enforcement. Its tendency to create prejudice against any of the defendants then on trial was neither direct nor strong. United States v. Allied Stevedoring Corp., supra. Only the fact that this speech was made by the prosecutor gives any color at all to the claim of prejudice now raised. Because the article contained comment about the bribery of law-enforcement agents, it may have had a more direct thrust against the Customs officers on trial below than against the other appellants. And for other reasons set forth above, we have held that the verdicts against them cannot stand. As to the other appellants, we conclude that the possibility of resulting prejudice, especially in view of the judge's admonition, was too remote to affect the fairness of the trial or the validity of the convictions. United States v. Allied Stevedoring Corp., supra. In United States v. Postma, 2 Cir., 242 F.2d 488, certiorari denied McConnon v. United States, 354 U.S. 922, 77 S.Ct. 1380, 1 L.Ed.2d 1436, convictions were affirmed in spite of contemporary newspaper publicity distinctly more damaging to the defendants than the article involved in this case.

■ Many other complaints are made about the conduct of the United States Attorney during the course of the trial. Most of these relate to his summation. The appellants, relying upon Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314, and United States v. Spangelet, 2 Cir., 258 F.2d 338, assert that the United States Attorney placed his own integrity in the scales to support the credibility of his witnesses and that he improperly stated that he would never engage in any unfair tactics. It is true that in United States v. Spangelet, supra, we reversed where the prosecutor supported the credibility of a government witness by the statement that he had never made a deal. This summation, however, is in a radically different posture, because of the charges made by defense counsel in their summation. These charges need not be detailed at length: there were statements that two Government employees had "framed" the defendants; that the United States Attorney had no choice but to prosecute

the defendants; and that he himself did not believe the prosecution witnesses. In replying to these charges, the United States Attorney was well within his rights. See Lawn v. United States, 355 U.S. 339, 359 note 15, 78 S.Ct. 311, 2 L.Ed.2d 321, affirming United States v. Giglio, 2 Cir., 232 F.2d 589; Henderson v. United States, 6 Cir., 218 F.2d 14, 50 A.L.R.2d 754; Malone v. United States, 7 Cir., 94 F.2d 281, certiorari denied 304 U.S. 562, 58 S.Ct. 944, 82 L.Ed. 1529.

■ However, one comment in the Government's summation we must hold to constitute error. In discussing the corroboration of the Government's witnesses, the United States Attorney remarked: "Even Brisbois, who had the courage to take the stand * * *" Objections were immediately and properly taken. The comment was improper because it indirectly called attention to the failure of other defendants to take the stand: it was tantamount to saying that certain of the defendants lacked the courage to take the stand. Wilson v. United States, 149 U.S. 60, 13 S.Ct. 765, 37 L.Ed. 650; Rice v. United States, 2 Cir., 35 F.2d 689, certiorari denied 281 U.S. 730, 50 S.Ct. 246, 74 L.Ed. 1146; Morrison v. United States, 8 Cir., 6 F.2d 809. Nevertheless, in the context of this long trial, we think the incident not so prejudicial as to require a new trial. Several of the defendants' counsel had already commented upon their clients' failure to take the stand and had informed the jury that no adverse inference was to be drawn therefrom. Furthermore, Brisbois' counsel had emphasized that his client had taken the stand. The damaging fact had therefore already been put before the jury by the defense. Cf. United States v. Feinberg, 2 Cir., 140 F.2d 592, 595, 154 A.L.R. 272. Moreover, a clear instruction to the jury was included in the judge's charge. This, we have held, may cure such error. United States v. De Vasto, 2 Cir., 52 F.2d 26, 78 A.L.R. 336, certiorari denied 284 U.S. 678, 52 S.Ct. 138, 76 L.Ed. 573;

United States v. Di Carlo, 2 Cir., 64 F.2d 15; see Wilson v. United States, supra.

■ We hold also that reversible error is not to be found in the prosecutor's remark, after Ewing was asked his address, "Don't be afraid to give it to us." The judge immediately reproved the prosecutor and admonished the jury that the remark was to be disregarded. United States v. Achilli, 7 Cir., 234 F.2d 797, affirmed 353 U.S. 373, 77 S.Ct. 995, 1 L.Ed.2d 918. Indeed, we doubt that the jury would have perceived any prejudicial connotation in the remark were it not for the objections it evoked. And, lastly, the prosecutor's remark, upon summation, that Ewing was living under guard in a Brooklyn hotel was a fair response, we hold, to the defense contention that he was living off the fat of the land. That the remark carried a possible implication that the guard was for Ewing's protection may not have been perceived by the jury until raised by the defense. For it was known to the jury that Ewing was a convicted criminal awaiting sentence. Upon objection, however, the judge again gave the jury an appropriate admonition.

■ To support their attack on the conduct of the prosecutor, counsel cites Handford v. United States, 359 U.S. 120, 79 S.Ct. 722, 3 L.Ed.2d 673 in which the decision reported in 5 Cir., 260 F.2d 890 was reversed in a brief *Per Curiam* "[u]pon consideration of the entire record and the confession of error by the Solicitor General." Counsel have made available to us the Solicitor General's memorandum in response to Handford's petition for certiorari from which it appears that in the Handford trial the prosecutor, in his summation, had wholly without warrant made a prejudicial reference to the defendant's financial affluence. There was no comparable comment made in the case at bar. The appellants complain of the following observation of the prosecutor: "I am not going to deal in generalities; I haven't got time. I have been allowed five hours to answer 15 hours of the most subtle

argument, cleverly distorted pictures of parts of the case, by the most able criminal lawyers practicing before any bar of justice." We fail to understand how this passage, which merely returned the compliment which the defendants had paid to the skill of the prosecutor, can be thought to deserve the censure implicit in the Handford *Per Curiam*. This and the other passages which the appellants criticize we think constituted no more than fair and vigorous advocacy: it was argument called for in response to arguments made in the summations for the appellants.

■ We proceed now to a consideration of various miscellaneous claims of error. Relying upon a statement in United States v. Aron, 2 Cir., 239 F.2d 857, appellants contend that the statements made by Aron to Lafitte were extrajudicial admissions, for which corroboration is required. Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101. We find that Lafitte's testimony below was corroborated in many particulars—the story of the Boston trip, for example, was supported by the testimony of Taylor. But we need not rest upon this to overrule this claim of error. For it is clear that in the context of this case Aron's declarations cannot properly be classified as extrajudicial admissions. They were made during the life of the conspiracy and were not therefore admissions after the fact. See Smith v. United States, 348 U.S. 147, 155, 75 S.Ct. 194, 99 L.Ed. 192; Warszower v. United States, 312 U.S. 342, 61 S.Ct. 603, 85 L.Ed. 876. They were in furtherance of the conspiracy, since, as Lafitte testified, Gelb, Baruche and Aron were seeking his participation. And they were not subject to those weaknesses which characterize admissions or confessions made under pressure of police investigation. Smith v. United States, supra; United States v. Winston, 7 Cir., 222 F.2d 323. In short, they were not admissions for which corroboration is legally required.

■ The appellant Mirra contends that "in a mass trial such as here," he was entitled as of right to a charge that the Government's evidence against him through the testimony of Basile, a coconspirator, was uncorroborated; a charge explaining what uncorroborated testimony is; and a charge that uncorroborated testimony of an accomplice should be scrutinized with great caution. He cites no cases which support these contentions. The applicable law does not require the corroboration of accomplice testimony. Caminetti v. United States, 242 U.S. 470, 495, 37 S.Ct. 192, 61 L.Ed. 442; United States v. Moran, 2 Cir., 151 F.2d 661, 167 A.L.R. 403; United States v. Schwartz, 2 Cir., 150 F.2d 627, certiorari denied 326 U.S. 757, 66 S.Ct. 97, 90 L.Ed. 454; United States v. Quinn, 2 Cir., 124 F.2d 378; United States v. Gallo, 2 Cir., 123 F.2d 229. Nor would omission of a charge about the necessary caution with which a jury should approach accomplice testimony necessarily constitute reversible error, although it is the better practice to give it. Caminetti v. United States, supra; United States v. Wilson, 2 Cir., 154 F.2d 802, vacated for resentencing 328 U.S. 823, 66 S.Ct. 1363, 90 L.Ed. 1603; Pittsburgh Plate Glass Co. v. United States, 4 Cir., 260 F.2d 397, certiorari limited to another question 358 U.S. 917, 79 S.Ct. 289, 3 L.Ed.2d 237; United States v. Bucur, 7 Cir., 194 F.2d 297. Here, it is true that the Government's whole case against Mirra rested on the uncorroborated testimony of Basile, a coconspirator. But in his charge the judge pointed out that counsel for Mirra contended that Basile's testimony had been discredited and that there was some evidence of friction between Basile and Mirra. He charged explicitly that "if you do not believe the testimony of Basile concerning the defendant Mirra, then you must find Mirra not guilty." This was followed by comprehensive and lucid general instructions as to the tests of credibility. We find no error in Mirra's conviction.

■ The appellants also complain that they were denied access to a report to which they claim to have been entitled under the rule of Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d

2103. The "report" in question was a summary by a Government narcotics agent of interviews with the Government witness, Ewing, prepared partly from recollection and partly from contemporary jottings over a period of about eight months. The report was in the agent's language, not Ewing's, and it had never been shown to, or adopted by, Ewing. When these facts had been developed in a hearing, the judge after seeing the report sustained the Government's refusal to disclose this report to the defense [16] upon the ground that it was not "substantially verbatim" nor "recorded contemporaneously" and hence not within the purview of 18 U.S.C.A. § 3500. The ruling was plainly right. The appellants, however, contend that to the extent that § 3500 restricts the right of inspection under the Jencks rule it is unconstitutional. As to this, unless and until the Supreme Court rules otherwise we shall adhere to the position which we took in United States v. Spangelet, supra; United States v. Palermo, 2 Cir., 258 F.2d 397, certiorari granted 358 U.S. 905, 79 S.Ct. 236, 3 L.Ed.2d 227; and United States v. Lev, 2 Cir., 258 F.2d 9, certiorari granted 358 U.S. 903, 79 S.Ct. 231, 3 L.Ed.2d 226. We hold that the enactment of § 3500 was a valid exercise of Congressional power.

It is also urged that the trial judge unduly limited the cross-examination of certain witnesses. The claimed errors relating to the cross-examination of Lafitte may be quickly disposed of. The first of these relates to the trial judge's refusal to allow inquiry as to Lafitte's address. See Alford v. United States, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624. However, somewhat later he instructed the United States Attorney to turn the address over to the defendants, whereupon defense counsel specifically withdrew their request. Moreover, the cross-examination directed to Lafitte's background was so complete and searching that we think it would have been proper for the trial judge to decide that the subject of his credibility had been thoroughly explored and to call a halt to this aspect of the cross-examination. Alford v. United States, supra, 282 U.S. at page 694, 51 S.Ct. at page 220; McCormick, Evidence (1954 ed.), page 56. The same rule is dispositive of the objections to certain matters relating to Ewing's testimony. Ewing had been convicted, by court martial, of desertion and of sodomy. The records of these convictions were introduced during his cross-examination. Upon Ewing's denial that he committed the homosexual act and his assertion that he could not remember whether any witnesses had testified against him, the defense sought to introduce the transcript of the court-martial proceedings. This it was not permitted to do. The evidence was asserted to be relevant to impeach credibility. But the particular matter involved went far beyond establishing a criminal conviction. It was a collateral matter, and we think the trial judge wisely exercised his discretion in excluding it. United States v. Tomaiolo, supra; United States v. Miller, 2 Cir., 246 F.2d 486, certiorari denied 355 U.S. 905, 78 S.Ct. 332, 2 L.Ed.2d 261. The cross-examination of Ewing which lasted for seven days was mostly devoted to attempted impeachment. Plain common sense precludes a holding that the inquiry was unduly restricted.

We have considered all other questions raised by the appellants and conclude that they lack sufficient merit to warrant further discussion.

The court extends its thanks to Messrs. Boyden, Delaney, and Polakoff for their exceedingly able representation of the appellants De Saverio, Aron and Seto as assigned counsel in this long and involved appeal.

For reasons already stated, the convictions of Samnick, Danis and Snyder are

---

16. After Ewing's direct examination, the Government delivered to the defense 260 pages of his contemporaneously recorded and substantially verbatim statements as well as his grand jury testimony.

**274**

reversed and remanded with directions to dismiss. Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356; Bryan v. United States, 338 U.S. 552, 70 S.Ct. 317, 94 L.Ed. 335; United States v. Silverman, 2 Cir., 248 F.2d 671, certiorari denied 355 U.S. 942, 78 S.Ct. 427, 2 L.Ed.2d 422. The convictions of all the other appellants are affirmed.