**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Calvin L. KEACH, Defendant-
Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Robert James SEAY, Defendant-
Appellant.**

**Nos. 72–1836, 72–1837.**

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted April 11, 1973.

Decided June 26, 1973.

Rehearing Denied July 25, 1973.

Emmett Colvin, Jr., Dallas, Tex. (Jerry R. Birdwell, Dallas, Tex., on the brief), for defendant-appellant Keach.

Donald N. Bykerk, Oklahoma City, Okl., for defendant-appellant Seay.

John E. Green, Asst. U. S. Atty. (William R. Burkett, U. S. Atty., on the brief), for plaintiff-appellee.

Before PHILLIPS, SETH and DOYLE, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge.

In No. 72–1836, Keach was charged in the first count of a two-count indictment with "unlawfully and knowingly" having "in his control, custody and possession, things and parts of things thereof in a manner made after or in the similitude of other things from which obligations and securities of the United States have been printed * * * with intent to use such other things and parts of things thereof, in forging and counterfeiting parts of obligations and securities of the United States, and obligations and securities of the United States all in violation of Section 474, Title 18, United States Code."[1]

In No. 72–1837, the second count of such indictment charges that Keach and Seay "and others to the Grand Jurors unknown, did conspire and agree together, and with others to the Grand Jurors unknown, in violation of Section 371, Title 18, United States Code, to commit certain criminal offenses against the United States of America, to-wit: to unlawfully and knowingly to have in their control, custody and possession, things and parts of things thereof in a manner made after or in the similitude of other things from which obligations and secu-

[1.] Such things and parts of things were enumerated in Count One, as follows:

"(1) One negative containing four images of the front side of $20 Federal Reserve Notes as follows: Federal Reserve Bank of Dallas, Texas, 1969A Series, Check Letter D, Face Plate 117; Federal Reserve Bank of Dallas, Texas, 1969 Series, Check Letter G, Face Plate 51; Federal Reserve Bank of Dallas, Texas, 1969A Series, Check Letter D, Face Plate 117; Federal Reserve Bank of Kansas City, Missouri, 1969 Series, Check Letter H, Face Plate 33;

"(2) One negative containing four images of the back side of; $20 Federal Reserve Notes with Back Plate Numbers 92, 92, 125, and 86;

"(3) One negative containing four images of the U. S. Treasury Seal;

"(4) One negative containing four images of the 'Twenty' overprint;

"(5) One negative containing images of four sets of Serial Numbers as follows: K 15991794 A, K 19177860 A, K 08852365 A, and J 14225040 A;

"(6) Offset aluminum plates bearing images of $20 Federal Reserve Notes along with partially-completed counterfeit Federal Reserve Notes totalling $52,580."

rities of the United States have been printed, that is plates and negatives bearing likeness or similitude of securities and obligations of the United States, being $20.00 Federal Reserve Notes, and partially-completed $20.00 Federal Reserve Notes, totalling $52,580.00, in violation of Title 18, United States Code, Section 474."

The second count of such indictment further alleged the overt acts, set out in note 2, which follows.[2]

The evidence fully warranted the jury in finding the following facts:

Henry McGrew, a printer by trade, on June 25, 1972, resided at 8105 South Villa Street, Oklahoma City, Oklahoma. Shortly prior to that date, he advertised an offset printing press for sale. It was a 1250 Multilith Press, Brown Model. He identified Government Exhibit 1 as a photograph of the press that he advertised for sale. He also identified Keach by pointing him out in the courtroom. He sold the press to Keach for $600, which was $50 less than the advertised price.

In the negotiations leading up to the sale, Keach asked McGrew what type of work the press would do. He stated that he did not know how to run the press, and further stated that he was in the silk screen business, which is one method of printing, and that he could get other printing jobs which would amount to enough so he could afford to buy the press.

After the sale was agreed on, Keach gave McGrew two $100 bills to hold the press, while he went to get a trailer in which to move the press. In a comparatively short time, Keach returned with the trailer, paid the balance, and took possession of the press. When Keach returned with the trailer, he was accompanied by a man who was about 30 years of age.

We digress from the chronology of our statement of facts to say the McGrew did not identify Seay as such man at the trial, nor was there any evidence that Seay was about 30 years of age.

William H. Sutherland was an agent with the United States Secret Service, and had been so employed for about four years. The Secret Service is charged with the protection of the President, the Vice-President, and certain other persons, as well as the investigation of all violations with respect to obligations and securities of the United States.

2. "To effect the object, or objects of the aforesaid conspiracy and agreement, one or more of the said defendants and co-conspirators committed the following overt acts or acts within the Western Judicial District of Oklahoma:
"OVERT ACTS
"1. The Grand Jury adopts all of the allegations in Count I by reference as the overt acts of defendants
CALVIN L. KEACH
and
ROBERT L. SEAY
respectively, for the purpose of executing and continuing the aforesaid conspiracy and agreement, and further alleges that sometime prior to July 9, 1972, said defendants obtained the apparatus, equipment, things and parts of things to set up the illegal printing machine to print and falsely make obligations and securities of the United States of America in Oklahoma County, Oklahoma.
"2. That on or about July 9, 1972, ROBERT J. SEAY acted as a lookout for CALVIN L. KEACH while said

KEACH was in the process of printing counterfeit $20.00 Federal Reserve Notes.
"3. That on July 9, 1972, ROBERT J. SEAY, entered a building in Oklahoma City, Oklahoma where CALVIN L. KEACH was printing counterfeit $20.00 Federal Reserve Notes, to alert the said KEACH of the approach of two individuals unknown to the said SEAY.
"4. That on July 3, 1972, CALVIN L. KEACH purchased water rollers for his press to print counterfeit Federal Reserve Notes.
"5. That on July 1, 1972, CALVIN L. KEACH and ROBERT JAMES SEAY made plans to print $150,000.00 in counterfeit $20.00 Federal Reserve Notes.
"6. That on July 9, 1972, CALVIN L. KEACH instructed ROBERT JAMES SEAY to install an intercom system in the building where the illicit operation was set-up, and for the said SEAY to sit outside to warn of anyone approaching said building."

Sutherland took a course of training given by the Treasury Department in basic law enforcement. He also attended the Secret Service Special Agents' Training School in Washington, D. C., where he had an opportunity to examine numerous counterfeit notes and the methods by which they were printed. He also had an opportunity to go to the Bureau of Engraving and Printing in Washington, D. C. and observe genuine currency being printed. He also went to the printing paper mill at Dalton, Massachusetts, and observed the genuine currency paper being manufactured there. He testified that the mill at Dalton, Massachusetts, was the only place where genuine currency paper was manufactured, on which the Bureau of Printing and Engraving printed all of the obligations and securities of the United States. He testified that he had had about four years of experience in the investigation of counterfeit obligations.

Sutherland was in Oklahoma City on July 1, 1972, and was then working in his undercover capacity. On that date he was at 1123 19th Street, Southwest, Oklahoma City, the residence of Dean Trotter. He there met Keach, Seay, and Trotter. Sutherland identified Keach and Seay and pointed them out in the courtroom. On that date, Sutherland had a conversation with Keach, but had none with Seay.

Just how Sutherland obtained the confidence of Seay is not disclosed in the evidence, but he obviously did so. The only thing that the evidence discloses is that later Sutherland discussed with Keach the purchase of some of the counterfeit notes which Keach was going to print.

Sutherland discussed with Keach the possibility of making some counterfeit currency. Keach showed Sutherland some papers which contained watermarks of old Council Three Bond and advised him that he had 2,000 sheets of such paper, size 8½ x 11, and that it was his intention to print approximately $150,000 of counterfeit $20 Federal Reserve Notes on such paper. Keach stated that although that amount could be printed, the watermark might show up enough on some of the notes after they were printed that they might have to be cut out and destroyed, so the full amount might not be $150,000.

Sutherland saw Keach and Seay again on July 1, 1972. They went to an abandoned church adjacent to 1123 19th Street, Southwest, where he had a further conversation with Keach, but none with Seay. At the church, Keach showed Sutherland a 1250 Multilith Printing Press and told him that he had purchased it for $600; that he would use it to print the $20 counterfeit notes on; and that it would be necessary to run the paper through the press nine times in order to print a sheet of four $20 Federal Reserve Notes.

Sutherland identified Government Exhibit 1 as a photograph of the printing press he had seen at the church on July 1, 1972.

Sutherland testified that he left the church at about 12:30 p.m. that day, but told Keach and Seay that he would see them later. About 8:30 p.m. of that same day, he returned to the church. Keach told him he was attempting to get the press lined up and showed him a negative of a photograph he had taken of some yellow pages from a Dallas telephone book, and that it had enough detail that he would be able to see how he could do like work printing counterfeit $20 Federal Reserve Notes by making a plate and using it to print up some sheets of paper. Keach said that if he had good luck he would be able to make some notes by the weekend, but he had to go to his home in Dallas, Texas, to get a camera to make some negatives for the $20 Federal Reserve Notes.

Sutherland told Keach he did not know how much he would be able to pay for the notes at that time.

Sutherland saw Keach and Seay again on July 3, 1972. He saw Keach in the abandoned church and Seay at the residence at 1123 19th Street, Southwest, at

about 10 a.m. Keach had made a print containing the image of the negative made from the yellow pages of the Dallas telephone book. The plate was on the printing press and Keach was printing sheets of paper and making adjustments on the press. Keach told Sutherland he was making adjustments for the purpose of aligning the press, and as soon as he got it aligned he was going to make negatives for the $20 Federal Reserve Notes. Keach said he was having a problem with the press; that he thought the problem was caused by water rollers, and that he was going to have to get some. Keach, Trotter, and Sutherland went to a printing supply house in Oklahoma City and Keach purchased a set of water rollers, printing supplies, and other items, and then returned to the church.

Sutherland identified Government Exhibit 12, an invoice from Dee's Photographic Supply, 900 North Hudson Street, Oklahoma City, which stated "Sold to C & C Printing."

It was about 11 or 11:30 a.m. when they went to Dee's Photographic Supply Company, and they then returned to the church. Keach installed the new rollers and continued his attempts to align the press. He said that as soon as he got the press properly aligned, he was going to make the negatives. He said he would have everything ready to go when he made the negatives. He further said he had made negatives before with a printer in California and did not anticipate any trouble with them. He said he was going to make the negatives at his residence in Dallas.

Sutherland next saw Keach and Seay on July 9, 1972, at 1123 19th Street, Southwest, Oklahoma City. He arrived at about 3:45 p.m. When he arrived, the set of negatives for the $20 Federal Reserve Notes was displayed to him. These consisted of one negative containing four images of the United States Treasury Seal; one negative containing four images of the word "Twenty" that appears "off" the Treasury Seal on the genuine Federal Reserve Notes; a nega-

tive containing four sets of serial numbers; a negative containing four images of the back of a $20 Federal Reserve Note, and one negative containing four images of the "basic face" of a $20 Federal Reserve Note.

Sutherland looked at the negatives and noted that the Treasury Seal negative was a rather good reproduction in the negative form of that seal. Keach said he had made it himself; that he had previously made a negative of the Treasury Seal for an individual, and that he had borrowed it back and made the particular negative he showed to Sutherland. He also said that he had reproduced these negatives at his residence at Dallas, Texas, on the homemade camera that he had previously described to Sutherland. Sutherland testified that was all the conversation he had with Keach on July 9, 1972, at the 19th Street, Southwest, address.

Sutherland said they departed that residence and went to the church, where Keach took the two negatives, one bearing the serial numbers and one bearing the United States Treasury Seal, and made a printing plate for the 1250 Multilith Press, attached it to the press, and began printing these images. That is, the serial numbers and the Treasury Seal on one side of the paper.

Before starting to make the plate for the printing operation, Keach told Seay to take an intercom which Keach had purchased in Dallas, Texas, and install it in the church inside the door and remain outside, where he could tell anybody inside over the intercom if anyone should approach the church. Seay followed those instructions.

Sutherland identified Government Exhibits 8 and 9 as the intercom system. He described the system as working with cords hooked together, and if a button was pushed at a point he designated and he talked over another one, it was reproduced inside where Keach and Sutherland were working.

In Sutherland's presence, Keach made constant adjustments on the printing

press as it was running. With the plates referred to, Keach printed probably 2,000 sheets of paper with the images of the serial numbers and Treasury Seal. Upon the completion of that operation, he took the negative bearing the four images of the back of the $20 Federal Reserve Notes and made another printing plate and attached it to the printing press and began to print the back of such notes on the reverse side of the sheet bearing the Treasury Seal and serial numbers. He made four images on each side of the sheets.

Sutherland examined Government Exhibit 10 and stated it was obviously part of the sheets of paper on one side of which the Treasury Seal and serial numbers were printed, and the sheets were the ones that Keach was printing at that time. Sutherland recognized the defects in the Treasury Seal.

Sutherland identified Government Exhibit 7 and stated it was sheets bearing four images of a $20 Federal Reserve Note on the back, which were printed at the time described above, and the other side bearing the serial numbers and Treasury Seal which had been printed previously.

The exhibits identified by Sutherland were admitted in evidence.

Sutherland left the church about 5:30 p.m. and advised Special Agent Strnad by radio that Keach was in the process of printing counterfeit Federal Reserve Notes in the abandoned church. Shortly before 11:30 p.m., July 9, 1972, Sutherland went to his car and advised the other Special Agents of that fact.

Keach began to have trouble with the printing press, and the paper began to hang up in the paper feed, but he continued printing such backs until approximately 11:40 p.m.

Sutherland had advised the other agents at the Oklahoma Field Office to cover him and make the arrest at that time. Shortly after that time, the agents arrived at the old church. For some time prior thereto, Sutherland and Keach were in the church building and Seay was located about 20 yards outside the church building. He frequently talked to Keach and Sutherland over the intercom. A few minutes before the Special Agents arrived and entered the building and arrested Sutherland, Keach and Seay, Seay came to the front door, opened it, and told Keach and Sutherland that there were two individuals walking down the road in front of the church. Sutherland looked out through a crack left by the open door and saw the two men walking down the road. He recognized them as the Agent in Charge and the Assistant Agent in Charge of the Field Office in Oklahoma City. A few moments later, other Secret Service Agents arrived. At that time, Seay was in the church. A few minutes after the agents entered the church, they arrested Sutherland, handcuffed him, and took him away from the scene.

In addition to Keach's directing Seay to stand outside the door and act as a lookout, other precautions were taken to keep people from seeing inside the church or entering it. All the windows were boarded up with plywood and two-by-fours were put across the doors on the inside and outside of the church.

An affidavit for a search warrant, made by Gary L. Strnad, a Special Agent for the United States Secret Service, was sworn to before Charles R. Jones, a United States Magistrate, on July 9, 1972. It was erroneously dated July 8, 1972. We set out the body of the affidavit in Note 3, hereto.[3]

3. "The undersigned being duly sworn deposes and says:
   "That (on the premises known as) Former church building located in * * * Oklahoma City, * * * State of Oklahoma, described as a one-story, white frame building with gray shingles located approximately 25 yards East of the residence of Dean Trotter, which residence is numbered 1123 S.W. 19th Street, Oklahoma City, Oklahoma. Subject white frame building faces South toward S.W. 19th Street and is located approximately 25 yards North of said street. The rec-

A search warrant was issued on such affidavit by Charles R. Jones, United States Magistrate, the body of which is set out in Note 4, hereto.[4]

The search warrant was originally dated July 8, 1972. Magistrate Jones changed the date by striking out the figure "8" and by inserting the figure "9" and following it with his initials. He made the same change in the date of the affidavit. The record does not show when he changed the dates. The evidence showed that observations made by Sutherland in the old church, which he communicated to the other agents as the basis for the search warrant, actually took place on July 9, 1972, so the change made by the magistrate was correct.

While Keach was endeavoring to align the press, make the plates, and print with them, Sutherland assisted him when requested by him to do so. Trotter was present a good deal of the time, and he also assisted Keach when requested by him.

On cross-examination, Sutherland stated that he met Keach through Dean Trotter. Sutherland was introduced to Trotter by an Oklahoma Bureau of Investigation Agent, Tom Bunting. On June 29, 1972, Trotter informed Sutherland that Keach was in the process of carrying on counterfeit operations in the abandoned church building, and that Trotter, at Keach's request, gave the latter permission to use the church building. The printing press was set up in the church building when Sutherland went there on July 1, 1972.

At the time of the trial, Strnad was a member of the United States Secret Service, and had been for three years. Part of his duties was the investigation of the counterfeiting of United States currency. He had received training in that work in the United States Treasury School and in the United States Secret Service School. Before he entered the Secret Service, he had been employed as a printer. He conducted part of the investigation of Keach and Seay, and in the course thereof he engaged in the surveillance of Keach and Seay on July 1, 1972.

tangular dimensions of said building are approximately 20 ft. x 40 ft.

"Within these premises leased by Dean Trotter in the WESTERN District of OKLAHOMA there is now being concealed certain property, namely certain counterfeit monies in resemblance and similitude of genuine $20 Federal Reserve Notes of the United States of America and other counterfeit paraphernalia used in the manufacture of counterfeit Federal Reserve Notes of the United States of America. which are in violation of Title 18, Section 472 and Section 473, United States Code."

4. "To U.S. Secret Service, Gary Strnad, Special Agent, or any other authorized law enforcement officer: Affidavit having been made before me by Gary L. Strnad, Special Agent, Secret Service, * * * that on the premises known as former church building located in Oklahoma City, * * * State of Oklahoma, described as a one-story, white frame building with gray shingles located approximately 25 yards east of the residence of Dean Trotter, which residence is numbered 1123 S.W. 19th St., Oklahoma City, Oklahoma. Subject white frame building faces south toward S.W. 19th Street and

is located approximately 25 yards north of said street. The rectangular dimensions of said building are approximately 20 ft. x 40 ft.

"Within these premises leased by Dean Trotter in the Western District of Oklahoma there is now being concealed certain property, namely certain counterfeit monies in resemblance and similitude of $20 Federal Reserve Notes of the United States of America and other counterfeit paraphernalia used in the manufacture of counterfeit Federal Reserve Notes of the United States of America, which are in violation of Title 18 U.S.C. §§ 472, 473. and as I am satisfied that there is probable cause to believe that the property so described is being concealed on the premises above described and that the foregoing grounds for application for issuance of the search warrant exist.

"You are hereby commanded to search forthwith the place named for the property specified, serving this warrant and making the search at any time in the day or night and if the property be found there to seize it, leaving a copy of this warrant and a receipt for the property taken, * * *."

On the morning of July 1, 1972, he observed them arrive at the residence next to the church building in a red Mustang. He again had them under surveillance on July 3, 1972, while they were going to Dee's Photographic Supply Company in Oklahoma City. He again had them under surveillance on July 9, 1972, at 2:30 or 3 p.m. He observed them arrive at the church. He participated in the execution of the search warrant and the arrest of Keach and Seay about 11:45 p. m., July 9, 1972.

Government Exhibit 12 was an invoice for water rollers, pads for cleaning plates, and other printing supplies sold by Dee's Photographic Supply Company to C & C printing in Wichita Falls, Texas. Government Exhibit 13 was a contract from U-Haul Trailer Rental in the name of Keach, dated June 25, 1972, for which Keach paid $4.94. Government Exhibit 14 was three separate invoices from Arnold Taylor, Inc., a lithograph supply company in Dallas, Texas, made to Jim E. Green, dated June 27, 1972, and June 30, 1972, covering printing supplies and offset aluminum plates, plate developers, repair kits for a 1250 Multilith Press, scratch remover for plates, various types of ink, and other printing supplies. Those exhibits were taken from the possession of Keach when he was arrested on July 9, 1972.

When the agents entered the church, they observed many partially completed Federal Reserve Notes, ink supplies, a 1250 Multilith Press, and Keach, Seay, Trotter, and Sutherland. The press was not working when they entered the building. Attached to it was an impression cylinder bearing the foreign impression of the reverse side of a partially printed $20 Federal Reserve Note. There was unprinted paper in the paper feed and on the exchange or the end there was a partially printed sheet of $20 Federal Reserve Notes. Keach was completely covered with green ink from head to foot. He had it in his ears, mouth, nose, and on his hands.

There were many partially completed Federal Reserve Notes about the room.

All of the notes were counterfeit. The press was a counterfeit press. It was completely different from the Government presses which are located in Washington, D. C., and are used for printing genuine $20 Federal Reserve Notes and other obligations and securities of the United States.

Strnad also identified Government Exhibits 2 to 6, inclusive. They were seized at the church on July 9, 1972, when the agents were at the church. Exhibit 2 was a photographic negative of a $20 Federal Reserve Note. Exhibit 3 was an offset aluminum plate with four impressions of a United States Treasury Seal and eight serial numbers. Exhibit 4 was an offset blank taken off of a 1250 Multilith Press. Exhibit 5 was a standard offset aluminum plate, seized at the church on July 9, 1972, as was also Exhibit 6. Exhibit 5 had four impressions of the reverse side of a Federal Reserve Note. It was apparently produced by a poor image which had been taken off the press. Exhibit 6 was another aluminum plate, which was secured to an impression cylinder on the press when the agents entered the church on July 9, 1972. It had four impressions of the reverse side of a $20 Federal Reserve Note.

Prior to the time the agents entered the church on July 9, 1972, Strnad had the church under surveillance. He was about a mile away. He observed the figure of a person sitting just west of the church, near a tree located about 20 yards from the church. Strnad was the first of the agents to enter the church and he forced the door open by kicking it.

James B. Boyett, a United States Secret Service Agent of the Oklahoma City Division had been a Secret Service Agent for 10 years. On July 9, 1972, he was parked in his car some distance from the old church, waiting for Sutherland to give him certain information by radio. About 11 p.m. on July 9, 1972, he received a communication from Sutherland by radio. He and his fellow agents had planned to proceed immediately to

the church when they received such call. On receiving the call, they did so, and as they approached the church they observed a person 30 or 40 feet from the church building. As they came closer, the person proceeded to the door of the church and opened it. When he opened the door it lighted up the entrance, and they observed the person going inside the church. Boyett corroborated the testimony of Strnad as to the things the agents observed when they entered the church.

Gary Grazda was an Agent of the United States Secret Service and had been for two years. He was present when the search warrant was executed. He identified Government Exhibits 15 through 24, and stated they were polaroid photographs which he took inside the church at the time of the search. He testified that he saw a room full of counterfeit paraphernalia when he entered the church, and pointed out Keach and Seay in the courtroom at the trial.

At the close of the direct examination of the witness, McGrew, Mr. Emmett Colvin, Jr., one of counsel for Keach, stated:

"Your Honor, may we make a request from the bench?"

The reporter's notes then state:

"Thereupon, counsel and the reporter approached the bench whereupon the following proceedings were had out of the presence of the hearing of the jury as follows, to-wit:

"MR. BIRDWELL (also counsel for Keach): We would like, at this time, to have the grand jury testimony—

"THE COURT: What?

"MR. BIRDWELL: Any of the grand jury testimony or—

"THE COURT: Are you talking about the Jenks Act now?

"MR. BIRDWELL: Yes, sir.

"THE COURT: Do you have any testimony?

"MR. GREEN (Assistant United States Attorney): No, sir.

"THE COURT: Do you have any statement?

"MR. GREEN: Not for this witness. The, all we have is a summary —he has testified, which we will furnish to him.

"THE COURT: You have some Government agent summaries or reports of interviews?

"MR. GREEN: With him, yes, sir.

"THE COURT: You will provide those will you?

"MR. GREEN: Yes, sir.

"THE COURT: All right.

" (Thereupon, the following proceedings were had within the presence of the hearing of the jury as follows, to-wit: )

"MR. GREEN: At this time we would like to mark this as Government's Exhibit Number One which is the summary of the testimony of Mr. McGrew.

"MR. COLVIN: Your Honor, we would object to the attorney offering this in the presence of the jury.

"THE COURT: The jury will disregard the remarks of counsel.

"MR. COLVIN: Thank you, Your Honor. Your Honor, we have no questions of this witness.

"THE COURT: You may step down. Call your next witness, please.

"MR. GREEN: May this witness be excused, Your Honor?

"MR. COLVIN: No objections, Your Honor.

"THE COURT: You may be excused Mr. McGrew. Call your next witness please."

It will be noted that Colvin, before he had time to examine the McGrew summary, agreed that McGrew should be excused.

At the close of Agent Strnad's direct examination, Mr. Colvin asked this question:

"Q  Mr. Sternad, I will ask you, did you testify before the grand jury?

"A   No, sir, I didn't.

"Q   All right, I have no further questions."

That question was asked and answered in the presence of the jury.

At the close of the direct testimony of Agent Boyett, the following occurred in the presence of the jury:

"MR. COLVIN:   Your Honor, we have a request of the Government at this time as we had in the case of William Southerland.

"MR. GREEN:   Mr. Boyett did not appear before the grand jury. I am handing him——

"MR. COLVIN:   Your Honor, I believe I previously made an objection about——

"THE COURT:   Hand him what you wish to hand him, counsel, and that is all you have to do.

"MR. GREEN:   I want to identify it.

"THE COURT:   You can identify it outside the presence of the jury.

MR. COLVIN:   No questions, Your Honor.

"MR. BYKERK (Counsel for Seay): No questions, Your Honor.

"THE COURT:   Step down, please. Call your next witness."

At the close of the evidence of Agent Grazda, the following occurred in the presence of the jury:

"MR. COLVIN:   We would make the same request of the Government, Your Honor.

"MR. GREEN:   This witness did appear before the grand jury, Your Honor, but his testimony was not recorded or transcribed. There was no recording made to be transcribed.

"MR. COLVIN:   Your Honor, in view of the Court's previous ruling regarding the prosecutor's comments in regard to the turnover I would move for a mistrial.

"THE   COURT:   Motion will be overruled.   The jury will disregard counsel's comment.   Just hand him the papers.   You don't have to make any statements, counsel.

"MR. GREEN:   I thought he wanted—

"THE COURT:   He wanted you to hand him the papers but you don't have to make a statement.

"MR. GREEN:   May I approach the bench for clarification?

"THE COURT:   No, it won't be necessary.   The jury will disregard counsel's statement.   This is not for your decision and has nothing to do with your decision.   This is just a procedure.

"MR. GREEN:   Am I assuming he is not asking for the grand jury—

"THE COURT:   Please don't make comments, counsel.   It is not necessary.   The jury will disregard these comments of counsel.

"MR. COLVIN:   Your Honor, I think with the Court's ruling I would renew my motion for mistrial.

"THE COURT:   Overruled.   Jury will disregard counsel's statement."

The court then said:

"As I say, I don't know that counsel's comments are in any sense error. I only sustained an objection to them and admonished the jury out of an abundance of caution.   I think it would be entirely proper if I would tell the jury the effect of the Jenks Act and what is taking place since you object to it.   I will instruct the jury to disregard it.   In most cases this is told to the jury so they will understand what is going on.   I don't think there is any error involved, but since you object to it I told the jury to disregard it.   So just don't make any more statements.   Just hand the paper to them.   Just hand them the statements under the Jenks Act."

Thereupon, Mr. Colvin announced that there would be no cross-examination.

At no time did counsel for Keach ask the court to postpone the cross-examination until they had an opportunity to ex-

amine the statements of witnesses furnished to them by Mr. Green.

The Government then rested and the defense rested without calling any witnesses.

Counsel for Keach made a motion to suppress all tangible evidence seized on July 9, 1972, at the former church building, as described in the search warrant. The court overruled the motion. Counsel for Keach also objected to the admission of such evidence at the trial, and the court also overruled that objection.

■ Counsel for Keach contend that the place to be searched was not sufficiently described in the affidavit and search warrant. The pertinent language of the affidavit and search warrant with respect to this issue is identical, and is fully set out in Notes 3 and 4, supra.

It will be observed that both the affidavit and search warrant described the place to be searched as "the premises known as former church building located in * * * Oklahoma City," and particularly described such building as a one-story, white frame building with gray shingles" with the rectangular dimensions of 20 ft. x 40 ft., situated approximately 25 yards east of the residence of Dean Trotter, numbered 1123 S.W. 19th Street, Oklahoma City, facing south toward S.W. 19th Street, and located approximately 25 yards north of such street, and then stated "within these premises leased by Dean Trotter * * * there is now being concealed certain property," which property is particularly described.

The plural form "premises" may be properly used as referring to a single building. See Webster's New International Dictionary, 2d Ed. Unabridged. There is not a shadow of a doubt that the word "premises," as first used, referred to a single building—the church building—and that the reference to the location of Dean Trotter's residence was solely for the purpose of indicating the location of the church building.

■ Counsel for Keach argue that the words "within these premises leased by Dean Trotter" make such residence the place to be searched. It is perfectly obvious that the word "premises" at the beginning of the description refers to the single church building. It is a well-settled rule of construction that where a word is used in one part of a document, the same word used later has the same meaning, unless the context clearly shows the contrary. Here, the context, instead of showing the contrary, clearly shows that the first time and the last time the word "premises" was used, it referred to the former church building. From the very beginning to the end of the description, the language used refers solely to the church building, which is meticulously described. We reject the construction urged by Keach as a strained construction of one sentence, which construction does violence to the context of all the language which precedes it. Incidentally, the evidence at the trial showed that Trotter gave permission to Keach to use the church building, which explains the use of the phrase, "leased to Dean Trotter."

Counsel for Keach further contend that the affidavit and search warrant were originally dated July 8, 1972, and that the evidence showed that most of the facts averred by Strnad did not come to him until July 9, 1972.

The affidavit and search warrant show that both were corrected by Charles R. Jones, the United States Magistrate who issued the warrant, by changing the date from July 8, 1972, to July 9, 1972, and by adding his initials after the figure "9". When that correction was made does not appear in the record. A copy of the search warrant was given to Keach when it was served, and if the correction was made after the warrant was served, it is reasonable to assume that the astute counsel for Keach would have introduced the copy in evidence.

■ Dating the affidavit and search warrant July 8, 1972, instead of July 9, 1972, was clearly an inadvertent error. We think the Magistrate had lawful authority to correct the dates on

a showing made to him before the warrant was delivered to the officers, and the presumption is that he acted lawfully.

We do not imply that dating the affidavit July 8, 1972, vitiated it, had no correction been made.

■ Counsel for Keach further contend that the statement made by the Assistant United States Attorney in the presence of the jury with respect to marking as Government Exhibit 1, which was the summary of the testimony of Mr. McGrew, constituted prejudicial and reversible error. It will be recalled that all the Assistant United States Attorney said was, "At this time we would like to mark this as Government's Exhibit Number One which is the summary of the testimony of Mr. McGrew," and before it had been offered or tendered to counsel for Keach, one of his counsel, Mr. Colvin, interrupted and stated, "[W]e would object to the attorney offering this in the presence of the jury," and that the court then stated, "The jury will disregard the remarks of counsel," referring to the Assistant United States Attorney. Mr. Colvin then said, "Thank you, Your Honor. * * * we have no questions of this witness."

How the limited statement of the Assistant United States Attorney, which made no reference to turning such summary over to counsel for Keach, could prejudice Keach, we fail to see. In fact, it seems clear to us that it could not.

At the close of the direct testimony of Sutherland, the court said, "I think we should recess for lunch. Do you want to make the same request that you made to the last witness?" Counsel for Keach said, "Yes, Your Honor." The court then said, "Mr. Green, will you confer with them. They're talking about the Jenks Act. Will you confer with them about this?" The Assistant United States Attorney said, "Yes, Your Honor, I will." The court then excused the jury for lunch, after giving the usual instructions. The court then said, "Let the record show the jury has retired from the courtroom. Now, I understand, do the Defendants wish any copies of reports of this witness?" Counsel for Keach replied, "Yes, Your Honor." The court then said, "Do you have any such statements or grand jury testimony of this witness?" The Assistant United States Attorney said, "We have no grand jury testimony of this witness, Your Honor. We only have the reports of the interview with Special Agent Sternad that we would make available, that this witness made to Mr. Sternad." The court then said, "All right. Will you furnish that?" The Assistant United States Attorney replied in the affirmative.

At the close of the direct examination of Strnad, Mr. Colvin, in the presence of the jury, asked:

"Mr. Sternad, I will ask you, did you testify before the grand jury?

"A No sir, I didn't.

"Q All right, I have no further questions."

No request was made by counsel for Keach for any summary or reports made by Strnad.

At the close of the testimony of Boyett, Colvin stated in the presence of the jury:

"MR. COLVIN: Your Honor, we have a request of the Government at this time as we had in the case of William Southerland.

"MR. GREEN: Mr. Boyett did not appear before the grand jury. I am handing him—

"MR. COLVIN: Your Honor, I believe I previously made an objection about—

"THE COURT: Hand him what you wish to hand him, counsel, and that is all you have to do.

"MR. GREEN: I want to identify it.

"THE COURT: You can identify it outside the presence of the jury.

"MR. COLVIN: No questions, Your Honor."

It will be observed that counsel for Keach made this request in the presence of the jury, but he objected to the Assistant United States Attorney answering in the presence of the jury.

When the Assistant United States Attorney completed the direct examination of Grazda and said, "You may cross-examine," counsel for Keach, in the presence of the jury said:

"We would make the same request of the Government, Your Honor.

"MR. GREEN: This witness did appear before the grand jury, Your Honor, but his testimony was not recorded or transcribed. There was no recording made to be transcribed.

"MR. COLVIN: Your Honor, in view of the Court's previous ruling regarding the prosecutor's comments in regard to the turnover I would move for a mistrial.

"THE COURT: Motion will be overruled. The jury will disregard counsel's comment. Just hand him the papers. You don't have to make any statements, counsel.

"MR. GREEN: I thought he wanted—

"THE COURT: He wanted you to hand him the papers but you don't have to make a statement.

"MR. GREEN: May I approach the bench for clarification?

"THE COURT: No, it won't be necessary. The jury will disregard counsel's statement. * * *

"MR. GREEN: Am I assuming he is not asking for the grand jury—

"THE COURT: Please don't make comments, counsel. It is not necessary. The jury will disregard these comments of counsel.

"MR. COLVIN: Your Honor, I think with the Court's ruling I would renew my motion for mistrial.

"THE COURT: Overruled. Jury will disregard counsel's statement.

* * * * * *

"THE COURT: As I say, I don't know that counsel's comments are in any sense error. I only sustained an objection to them and admonished the jury out of an abundance of caution. * * * I don't think there is any error at all involved, * * * ."

Mr. Colvin, counsel for Keach, at the end of the testimony of the witnesses Boyett and Grazda and in the presence of the jury, repeated his request for the grand jury testimony of such witnesses and any reports made by them or any summary thereof, but he objected to the Assistant United States Attorney showing in the presence of the jury his compliance with such requests.

Keach contends that since neither of his counsel cross-examined any of the witnesses on the summary of the report which such witnesses, respectively, gave to the Assistant United States Attorney, the jury would infer that the summary supported the testimony of such witness at the trial, and that for that reason the court erred in denying a mistrial.

Surely, what occurred at the end of the cross-examination of McGrew and Sutherland did not warrant a mistrial.

With respect to the witnesses Boyett and Grazda, Keach made his request in the presence of the jury, but wanted the jury to be left in the dark as to whether the Assistant United States Attorney complied with the request. Having opened the matter up in the presence of the jury, we are of the opinion that what the Assistant United States Attorney thereafter said in the presence of the jury did not constitute any basis for the granting of the motion for a mistrial.

Whether the motion for a mistrial would have been well founded, had counsel for Keach not opened the matter up in the presence of the jury, we need not and do not decide.

We conclude that there was no prejudicial error in the trial of Keach and Affirm the judgments and sentences imposed on him.

This brings us to *No. 72–1837*—United States of America v. Seay.

We have carefully examined the evidence adduced against Seay. He was present with Keach on July 1, 3, and 9, 1972. There is no proof that he was present with Keach when the latter purchased the press or when he went to his home in Dallas to make the negatives. Keach was the dominant character of the two, and Seay seemed to be more like a lackey to Keach than a companion. Sutherland, while investigating what was going on at the old church and acting the part of a prospective purchaser of counterfeit $20 Federal Reserve Notes, apparently did not suspect Seay. He asked Seay no questions, and in fact had no conversations whatever with Seay.

When Keach talked with Sutherland about getting the paraphernalia together to print the counterfeit Federal Reserve Notes and told him how he would proceed in printing them, he always spoke in the first person, "I" and never "we." It is likewise apparent that Trotter, who gave the information to Sutherland, did not at any time suspect Seay.

Keach had purchased and installed the press, had made negatives of both sides of $20 Federal Reserve Notes, and had arrived at the point where he was ready to make aluminum plates from the negatives and start the printing operation when he gave Seay instructions to install the intercom and to act as lookout.

Seay followed such instructions and after he had acted as lookout for a while, he observed two persons walking down the road in front of the church and immediately warned Keach and Sutherland of such fact. The persons were Special Agents of the United States Secret Service. Apparently, after giving the warning, Seay stayed inside the church and Keach put up the two-by-fours to bar entrance to the church by the doors.

It will be noted that the conspiracy charged against Keach and Seay and other persons to the Grand Jurors unknown was that they had "in their control, custody and possession, things and parts of things thereof in a manner made after or in the similitude of other things from which obligations and securities of the United States" could be printed, "that is plates and negatives bearing likeness or similitude of securities and obligations of the United States, being $20.00 Federal Reserve Notes, and partially-completed $20.00 Federal Reserve Notes, * * * ."

While there is ample evidence showing that Keach exercised custody, control and possession over such things, there is no evidence whatever that Seay ever exercised any custody, control or possession over them. The undisputed evidence establishes that everything done to carry out the conspiracy was done by Keach.

While Seay installed the intercom and started to act as lookout before the plates were made, he did not do so until after Keach had obtained custody, control and possession of such "things and parts of things" which the indictment charged was the object of the conspiracy, and until the conspiracy had been consummated.

It may be that Seay was an accessory after the fact, which is defined in 18 U. S.C.A. § 3, as follows:

"Whoever, knowing that an offense against the United States has been committed, * * * assists the offender in order to hinder or prevent his apprehension * * * is an accessory after the fact."

However, that charge is not involved, and we express no opinion with respect to it.

It is true that Seay was with Keach from time to time, when Keach was engaged in getting together the necessary paraphernalia with which to print counterfeit $20 Federal Reserve Notes, but there is not a scintilla of evidence that Seay assisted Keach in any way in obtaining custody, control and possession over such paraphernalia.

Close and repeated association with one who is proved to have committed the criminal offense which was the

objective of the conspiracy does not, without more proof, establish that a person was a coconspirator.[5]

The judgment and sentence against Seay is reversed and the cause is remanded, with instruction to dismiss Court Two as to Seay.

---

5. United States v. Stromberg, 2 Cir., 268 F.2d 256, 267, cert. denied 361 U.S. 863, 80 S.Ct. 123, 4 L.Ed.2d 102.

United States v. Anderson, 6 Cir., 352 F. 2d 500, 501, cert. denied 384 U.S. 955, 86 S.Ct. 1576, 16 L.Ed.2d 550.